## McELROY *v.* UNITED STATES

No. 80–6680.   Argued January 12, 1982—Decided March 23, 1982

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. STEVENS, J., filed a dissenting opinion, *post*, p. 659.

*Thomas S. White* argued the cause for petitioner. With him on the brief was *George E. Schumacher.*

*Carter G. Phillips* argued the cause for the United States. With him on the brief were *Solicitor General Lee, Assistant Attorney General Jensen,* and *Joel M. Gershowitz.*

JUSTICE O'CONNOR delivered the opinion of the Court.

The petitioner was convicted of two counts of transporting a forged security in interstate commerce in violation of 18 U. S. C. § 2314. He challenges his conviction on the ground that the statute requires proof, concededly lacking at trial, that the securities had been forged before being taken across state lines. Because of a conflict among the Circuits on this issue of statutory construction, we granted certiorari. 454 U. S. 815 (1981). For the reasons stated below, we affirm the petitioner's conviction.

I

Petitioner Charles McElroy was indicted by a federal grand jury on three counts. Counts 1 and 3 charged that on two occasions the petitioner transported in interstate commerce falsely made and forged securities from Ohio to Pennsylvania in violation of 18 U. S. C. § 2314, the National Stolen Property Act.[1] Count 2 charged McElroy with trans-

---

[1] Title 18 U. S. C. § 2314 provides in pertinent part:

"Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce any falsely made, forged, altered, or counterfeited se-

porting a stolen car in interstate commerce from Pennsylvania to Ohio in violation of 18 U. S. C. § 2312.[2]

According to the proof at trial, several blank checks[3] were stolen from Local 125 of the Laborers' International Union in Youngstown, Ohio, in late March or early April 1977. After the Union discovered the theft, it closed the account on which the checks were drawn. Seventeen months later, in October 1978, the petitioner ordered a used Corvette from the Don Allen Chevrolet Agency in Pittsburgh, Pa., for $6,706. Using the name "William Jones," the petitioner told the salesman that he lived in Warrenville Heights, Ohio, but worked in the Pittsburgh area. The petitioner returned the next day and paid for the car with one of the stolen Union checks, on which a signature had been forged. After learning the following day from the drawee bank in Ohio that the account had been closed, the dealership made no effort to negotiate the check. This transaction formed the basis for count 1 (transportation of a forged check in interstate commerce) and count 2 (transportation of a stolen vehicle, the Corvette, in interstate commerce) of the indictment.

In December 1978, the petitioner sought to purchase a boat and trailer from the Rini Marine Sales Co. in Beaver Falls, Pa. Adhering to his previously successful scheme, he used the fictitious name "William Jones" and gave an Ohio address for his residence. One week after his initial inquiry he paid for a boat and trailer with one of the stolen Union checks, on

---

curities or tax stamps, knowing the same to have been falsely made, forged, altered, or counterfeited . . .

"Shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

[2] Title 18 U. S. C. § 2312 provides:

"Whoever transports in interstate or foreign commerce a motor vehicle or aircraft, knowing the same to have been stolen, shall be fined not more than $5,000 or imprisoned not more than five years, or both."

[3] Title 18 U. S. C. § 2311 states that, as used in §§ 2311–2318, the term "[s]ecurities includes any . . . check."

which a signature had been forged. Too late, Philip Rini, the owner of Rini Marine Sales, became suspicious and telephoned the Youngstown, Ohio, bank only to learn that the check had been stolen and the signature forged. He, too, abandoned hope of negotiating the check, and turned to the Federal Bureau of Investigation for help. Count 3 arose from this transaction.

At the conclusion of the Government's case, the petitioner moved for a judgment of acquittal on all three counts on the ground that the Government had not submitted sufficient evidence for the case to go to the jury. The petitioner contended that he was entitled to an acquittal on count 2 because the Government failed to submit any evidence showing that the petitioner had transported the Corvette from Pennsylvania to Ohio, and on counts 1 and 3 because the Government had not adduced any evidence showing that the petitioner had caused the stolen checks to be brought through interstate commerce into Pennsylvania. The trial court denied these motions.[4]

After the petitioner rested,[5] the trial court instructed the jury that in order to find the petitioner guilty on counts 1 and 3, it must find that he transported the check in a forged condition in "interstate commerce," and that such transportation could take place entirely within the State of Pennsylvania if it was a "continuation of the movement that began out of state." Tr. 164A.[6] The petitioner unsuccessfully objected

---

[4] Tr. 68A–78A.

[5] The petitioner introduced no evidence.

[6] The entire instruction on this issue was as follows:

"Well, [interstate commerce] means any movement or transportation of these forged checks from one state into another, and it includes all continuing movements of said forged check while in the second state, in this case Pennsylvania, until the movement of said forged check has ceased.

"Now, the Government must show that the checks were transported in interstate commerce in a forged condition. However, the transportation within the destination state here, Pennsylvania, may be considered trans-

to this instruction, contending that under § 2314 the Government had the burden of proving that the check was forged in Ohio before it was transported across the state line to Pennsylvania. Tr. 92A. The petitioner was convicted on all three counts, and sentenced to serve seven years on each of counts 1 and 3 and five years on count 2, the sentences on all three counts to run concurrently.

The Court of Appeals, sitting en banc, vacated the judgment on count 2, holding that the Government had presented insufficient evidence to sustain a conviction.[7] 644 F. 2d 274 (CA3 1981) (en banc). The court affirmed the judgment on counts 1 and 3, however, holding that the Government had

---

portation in interstate commerce if it is a continuation of the movement that began out of state.

"The Government need not exclude every speculative possibility that the transportation may have been interrupted at some point, nor need the Government show each step in the security's movement in interstate commerce.

"Now, if you believe that the Government has shown that the Defendant transported the checks while they were in a forged condition within the State of Pennsylvania, the requirements of the law are satisfied if that transportation was part of interstate commerce. In other words, the check had to originate at sometime in Ohio and had to have been transported at sometime in Pennsylvania in order to effect interstate commerce. So the Government must prove this Defendant transported the checks involved in Counts 1 and 3 of the indictment in interstate commerce between Ohio and Pennsylvania, but need not prove the place in Ohio from which the checks started or from where the Defendant started." *Id.*, at 164A–165A.

After some discussion at the bench with the lawyers, the judge further instructed the jury:

"As to Counts 1 and 3, the Government must prove with evidence that convinces you beyond a reasonable doubt that the Defendant caused the transportation of the two checks in question, that is, in Counts 1 and 3, the check to Rini, the check to Don Allen Chevrolet, in interstate commerce, from Ohio to Pennsylvania." *Id.*, at 181A.

[7] That part of the Court of Appeals' judgment vacating the conviction on count 2 is not before this Court.

presented sufficient evidence to sustain the convictions, and that the trial judge correctly had instructed the jury that the Government need not prove that the stolen checks had been forged before crossing state lines. "It is immaterial whether the signatures were forged in Ohio or in Pennsylvania. If at any point in the interstate movement the check was in a forged condition, the statute was satisfied." *Id.*, at 279. All but one judge agreed with the majority's construction of the phrase "interstate commerce" as used in § 2314.[8]

## II

The question presented by this case is one of statutory construction.[9] The petitioner claims that the language and legislative history of § 2314 demonstrate congressional intent to limit the reach of that provision to those persons who transport forged securities across state lines. As a fallback position, the petitioner contends that § 2314's use of the expression "interstate commerce" is sufficiently ambiguous to

---

[8] Judge Adams, joined by Chief Judge Seitz, concurred in the majority opinion on counts 1 and 3, but dissented from the court's holding that the conviction on count 2 should be vacated. Although he agreed that the trial judge correctly had instructed the jury on counts 1 and 3, Judge Garth dissented from the affirmance on those counts, arguing that the Government had presented insufficient evidence to sustain the convictions. Judge Higginbotham concurred with the majority opinion on count 2, but dissented from its holdings on counts 1 and 3. He reasoned that § 2314 was ambiguous, and that consequently the principle of lenity required the court to construe the statute strictly against the Government and hold that the statute was violated only if the security had been forged before crossing state lines.

[9] The petitioner concedes that Congress has authority under the Commerce Clause, Art. I, § 8, cl. 3 (which provides in part that "Congress shall have Power . . . To regulate Commerce . . . among the several States"), to enact a criminal statute prohibiting the transportation in interstate commerce of a security that was not forged until after crossing state lines. Consequently, the issue in the present case is the meaning that Congress ascribed to the phrase "interstate commerce" in § 2314.

require this Court to apply the principle of lenity and construe the provision in the petitioner's favor.[10]

## A

Petitioner bases his initial argument on Congress' use of the past tense "forged" in § 2314, from which he urges us to infer that Congress intended to prohibit only the transportation of securities that were forged before entering the stream of interstate commerce, that is, before crossing state lines. Fundamental to the petitioner's argument is the unarticulated assumption that "interstate commerce," as used in the section, does not continue after the security has crossed the state border. However, if subsequent movement of the check in the destination State constitutes interstate commerce, then a forgery of the check in the course of that movement involves transportation of a forged security in interstate commerce in violation of § 2314. Thus, the validity of the petitioner's argument turns on whether the statutory phrase "interstate commerce" comprehends movement of a forged security within the destination State.

The paragraph of § 2314 under which the petitioner was convicted prohibits the "transport[ation] in interstate or foreign commerce [of] any . . . forged . . . securities . . . , knowing the same to have been . . . forged.". Title 18 U.S.C. § 10 provides that the "term 'interstate commerce,' as used in this title, includes commerce between one State . . . and another State." On their face, these two provisions are not limited to unlawful activities that occur while crossing state borders, but seemingly have a broader reach. In particular, the lan-

---

[10] Although the petitioner challenged the sufficiency of the evidence on counts 1 and 3 in his petition for writ of certiorari, this Court limited the grant of certiorari to the statutory construction issue. Thus, we accept the Court of Appeals' conclusion that the evidence was sufficient to sustain the jury's finding that "on each occasion [the petitioner] made a trip from Ohio to Pennsylvania, carrying with him a check that was forged either in Ohio or Pennsylvania." 644 F. 2d 274, 279 (CA3 1981).

guage of § 10 suggests that crossing state lines is not the sole manifestation of "interstate commerce." [11]

The origin of the "interstate commerce" element of § 2314 was the National Motor Vehicle Theft Act (Dyer Act), 41 Stat. 324,[12] which was enacted in 1919 to provide "severe pun-

---

[11] The predecessor of 18 U. S. C. § 10 was § 2(b) of the Dyer Act, which stated that the term "interstate commerce" "shall include transportation from one State . . . to another State." 41 Stat. 325.

[12] The Act provided in part:

"SEC. 2. That . . . :

"(b) The term 'interstate or foreign commerce' as used in this Act shall include transportation from one State . . . to another State . . . .

"SEC. 3. That whoever shall transport or cause to be transported in interstate or foreign commerce a motor vehicle, knowing the same to have been stolen, shall be punished by a fine of not more than $5,000, or by imprisonment of not more than five years, or both.

"SEC. 4. That whoever shall receive, conceal, store, barter, sell, or dispose of any motor vehicle, moving as, or which is a part of, or which constitutes interstate or foreign commerce, knowing the same to have been stolen, shall be punished by a fine of not more than $5,000, or by imprisonment of not more than five years, or both."

The Act was expanded in 1934 to cover other types of stolen property, see National Stolen Property Act, 48 Stat. 794, and in 1939 to cover forged securities. See Act of Aug. 3, 1939, 53 Stat. 1178. Sections 3 and 4 were later codified as 18 U. S. C. §§ 2312 and 2313 respectively. None of the legislative Reports or debates concerning these amendments, however, contains any explanation of the "interstate commerce" requirement. See H. R. Rep. No. 1462, 73d Cong., 2d Sess., 2 (1934) (stating that the new Act was "designed to punish interstate transportation of stolen property, securities, or money," and that it was "drafted to follow the language of the Dyer Act, the constitutionality of which has frequently been upheld in the Federal courts"); S. Rep. No. 538, 73d Cong., 2d Sess., 1 (1934) (approving a Justice Department memorandum stating that the purpose of the Act is "to provide a penalty for knowingly transporting stolen property in interstate or foreign commerce"); H. R. Rep. No. 422, 76th Cong., 1st Sess., 1 (1939) (stating that the bill "widens the scope of the National Stolen Property Act of 1934 . . . by making its provisions applicable to embezzled property, securities and money"); S. Rep. No. 674, 76th Cong., 1st Sess., 2 (1939) (approving a letter from the Attorney General stating in part that

ishment of those guilty of the stealing of automobiles in interstate or foreign commerce." H. R. Rep. No. 312, 66th Cong., 1st Sess., 1 (1919). See S. Rep. No. 202, 66th Cong., 1st Sess., 1 (1919) (describing the bill as designed to "punish the transportation of stolen motor vehicles in interstate or foreign commerce"). Representative Dyer, the sponsor of the bill that was enacted, defended Congress' authority to enact the proposed law, noting that the courts had upheld a variety of regulatory statutes enacted under the Commerce Clause, including a criminal statute declaring unlawful the "[l]arceny of goods from railroad cars being transported in interstate commerce." 58 Cong. Rec. 5472 (1919).[13] In response to a question from Representative Anderson concerning possible differences in the meaning of "interstate commerce" in §§ 2 and 4 of the Act, Representative Dyer replied:

> "[I]f there is any difference there, which I do not see, the matter would be construed by the Supreme Court, which has passed many times upon what is meant by interstate and foreign commerce." *Ibid.*[14]

---

the "principal purposes of the pending bill are to extend the existing law to property that has been embezzled, and also to forged or counterfeited securities").

[13] Obviously, Representative Dyer believed that a federal crime would be committed even though the larceny did not occur at the exact moment that the railroad car crossed a state line. It is fair to conclude from this example that he understood "interstate commerce," as used in the Dyer Act, to have a broader meaning than transportation across state lines.

[14] The entire colloquy between Representatives Dyer and Anderson is as follows:

"Mr. ANDERSON. I will ask the gentleman whether the committee meant the same thing in its definition of interstate commerce in section 2 as it meant in section 4?

"Mr. DYER. I think so. If the gentleman will point out wherein it differs, I shall be glad.

"Mr. ANDERSON. In the definition under section 2 interstate commerce means transportation from one State to another, while if you refer to

Plainly, Representative Dyer, the chief sponsor of the bill, believed that the statutory meaning of "interstate commerce" could be found in previous Supreme Court decisions using the

---

section 4 you find there you have a vehicle or motor car constituting interstate or foreign commerce, and you scarcely have a sensible section.

"Mr. DYER. I will say to the gentleman that if there is any difference there, which I do not see, the matter would be construed by the Supreme Court, which has passed many times upon what is meant by interstate and foreign commerce. I think it really is not necessary to put the definition in this bill. It was done at the request of some of the members of the committee. The Supreme Court has decided many times what is interstate commerce. I do not think myself that any definition is necessary." 58 Cong. Rec. 5472 (1919).

Of course, the definition to which Representative Dyer refers stated that interstate commerce "shall *include* transportation from one State . . . to another State." 41 Stat. 325 (emphasis added). The dissenting opinion entirely ignores Congress' use of the word "include" in the 1919 Act, choosing instead to read the definition as if Congress' only "objective . . . was to proscribe the transportation of a stolen automobile from one State to another." *Post,* at 666.

In the 1934 National Stolen Property Act, 48 Stat. 794, Congress expanded the coverage of the Dyer Act, and in § 2(a) provided that "[t]he term 'interstate . . . commerce' shall mean transportation from one State . . . to any State." The House Report makes clear that the "bill is drafted to follow the language of the Dyer Act, the constitutionality of which has frequently been upheld in the Federal courts." H. R. Rep. No. 1462, 73d Cong., 2d Sess., 2 (1934). Although a "change of [statutory] language is some evidence of a change of purpose," *Johnson* v. *United States,* 225 U. S. 405, 415 (1912), the inference of a change of intent is only "a workable rule of construction, not an infallible guide to legislative intent, and cannot overcome more persuasive evidence." *United States* v. *Dickerson,* 310 U. S. 554, 561 (1940). Because the legislative history contains no indication that the variation in the language had changed the meaning of "interstate commerce," and more importantly, because the House Report states that the language of the 1934 Act was drafted to follow the language of the Dyer Act, we conclude that Congress intended nothing by the change in language. Moreover, in 1948; Congress made an additional modification in the definition of "interstate commerce," this time resubstituting the word "include" and substituting the word "commerce" for the word "transportation" to "avoid the narrower connotation" of the latter word. H. R. Rep. No. 304, 80th Cong., 1st Sess., A7 (1947). If any inference can be drawn

phrase to define the scope of congressional authority under the Commerce Clause. See also H. R. Rep. No. 312, 66th Cong., 1st Sess., 3–4 (1919) (justifying Congress' authority to enact the Dyer Act by reference to this Court's decisions holding that Congress has plenary power under the Commerce Clause to regulate interstate commerce).

Although the House Report accompanying the bill, as well as several Members of Congress during the debates, stated that the Act would prevent the transportation of stolen automobiles across state lines,[15] Congress' use of the more general

from these changes, both in 1934 and in 1948, it is only that Congress intended no substantive change in the meaning of "interstate commerce."

[15] See H. R. Rep. No. 312, 66th Cong., 1st Sess., 1 (1919) (noting that "[t]hieves steal automobiles and take them from one State to another and ofttimes have associates in this crime who receive and sell the stolen machines"); id., at 3 ("The power of the Congress to enact this law and to punish the theft of automobiles in one State and the removing of them into another State can not be questioned"); id., at 4 ("No good reason exists why Congress, invested with the power to regulate commerce among the several States, should not provide that such commerce should not be polluted by the carrying of stolen property from one State to another"); 58 Cong. Rec. 5470 (1919) (remarks of Rep. Dyer) (stating that "this bill is for the purpose of providing punishment for those stealing automobiles and automobile trucks and taking them from one State to another State"); id., at 5472 (remarks of Rep. Dyer) ("Section 3 provides for the punishment of a thief stealing a car and transporting it from one State to another"); id., at 5473 (remarks of Rep. Reavis) (stating that he would support a broader bill that would make it a "felony to transport stolen property of any kind from one State to another"); ibid. (remarks of Rep. Igoe) ("The offense sought to be reached in the act is the transportation, the taking it across the line, taking it from one State to another"); id., at 6433 (remarks of Sen. Cummins) (stating that the "bill is for the purpose of giving the Federal courts jurisdiction for the punishment of" thieves who carry stolen automobiles across state lines).

None of these statements, however, purports to limit the statutory definition of interstate commerce to the act of crossing state lines. Nor is there any basis to believe that Congress used the phrase "interstate commerce" in the statute interchangeably with "'interstate transportation' . . . or some such phrase focusing on state lines." STEVENS, J., dissenting,

phrase "interstate commerce" and its reliance on this Court's constitutional decisions defining the scope of "interstate commerce" indicate that Congress intended the statutory phrase to be as broad as this Court had used that phrase in Commerce Clause decisions before 1919.[16]  In those decisions, this Court had made clear that interstate commerce begins well before state lines are crossed, and ends only when movement of the item in question has ceased in the destination State.[17]  We conclude, therefore, that in § 2314 Congress in-

---

*post*, at 663–664.  While Congress may have been concerned principally with thieves who cross state borders with stolen cars, it did not so limit the language of the statute.  Instead, Congress drafted a more comprehensive statute that would reach criminals who use interstate channels to avoid detection and punishment.

The dissenting opinion's alternative explanation—that Congress used the expression " 'interstate commerce' merely to indicate the source of its authority," *post*, at 665—is also unpersuasive.  Although supporters of the bill were careful to justify its constitutionality, nothing in the statutory language or the legislative history indicates that Congress used the constitutionally significant term "interstate commerce" in the bill merely to point to its authority to enact such legislation.  Rather, the most rational inference is that Congress used the term to specify the types of activities proscribed by the Act—thefts involving "interstate commerce" as that term had been interpreted by this Court.

[16] Some Circuits have even indicated that the statutory phrase "interstate commerce" is coextensive with congressional authority under the Commerce Clause.  See *United States* v. *Roselli*, 432 F. 2d 879, 891 (CA9 1970) ("The sole reason for conditioning [§ 2314's] prohibitions upon use of interstate commerce is to provide a constitutional basis for the exercise of federal power"), cert. denied, 401 U. S. 924 (1971); *United States* v. *Ludwig*, 523 F. 2d 705, 707 (CA8 1975) (same), cert. denied, 423 U. S. 1076 (1976).

[17] See *Champion* v. *Ames*, 188 U. S. 321, 358 (1903) (illustrating that a regulatory statute enacted under the Commerce Clause can take the form of a prohibition, the Court stated that "it cannot be doubted that Congress, under its power to regulate commerce, may . . . provide for [cattle to be] inspected before transportation begins"); *Southern Pacific Terminal Co.* v. *ICC*, 219 U. S. 498, 527 (1911) (goods are in "interstate . . . commerce when they have 'actually started in the course of transportation to another

tended to proscribe the transportation of a forged security at any and all times during the course of its movement in interstate commerce, and that the stream of interstate commerce may continue after a state border has been crossed. Consequently, the trial judge in this case correctly instructed the jury that McElroy's transportation of the forged check within Pennsylvania would violate § 2314 if the jury found that movement to be a "continuation of the movement that began out of state." Tr. 164A.[18]

Moreover, the purpose underlying § 2314 leads us to conclude that Congress did not intend to require federal prosecutors to prove that the securities had been forged before crossing state lines. In *United States* v. *Sheridan*, 329 U. S. 379, 384 (1946), this Court observed that in § 2314 Congress "contemplated coming to the aid of the states in detecting and punishing criminals whose offenses are complete under state law, but who utilize the channels of interstate commerce to make a successful getaway and thus make the state's detecting and punitive processes impotent" (footnote omitted).

---

State, or [are] delivered to a carrier for transportation'") (quoting *Coe* v. *Errol*, 116 U. S. 517, 525 (1886)); *Texas & N. O. R. Co.* v. *Sabine Tram Co.*, 227 U. S. 111, 122–123 (1913); *Illinois Central R. Co.* v. *Fuentes*, 236 U. S. 157, 163 (1915) ("generally when this interstate character has been acquired it continues at least until the load reaches the point where the parties originally intended that the movement should finally end").

The House Report on the Dyer Act cited *Champion* v. *Ames, supra*, to justify Congress' constitutional authority to enact the Dyer Act. H. R. Rep. No. 312, 66th Cong., 1st Sess., 4 (1919).

[18] Even though Congress did not address the meaning of "interstate commerce" in the 1934 and 1939 extensions of the Dyer Act, there is no reason to believe that Congress abandoned its original meaning. In fact, because the Supreme Court between 1919 and 1939 continued to define interstate commerce more broadly than merely as commerce crossing state lines, see, e. g., *Champlain Realty Co.* v. *Brattleboro*, 260 U. S. 366 (1922); *Carson Petroleum Co.* v. *Vial*, 279 U. S. 95 (1929), there is ample reason to believe that Congress intended § 2314 to have the same reach as its predecessor section in the Dyer Act.

Given this broad purpose, we find it difficult to believe, absent some indication in the statute itself or the legislative history, that Congress would have undercut sharply that purpose by hobbling federal prosecutors in their effort to combat crime in interstate commerce. Under the petitioner's proposed construction, a patient forger easily could evade the reach of federal law, yet operate in the channels of interstate commerce.[19] As the Government points out in its brief,

---

[19] The facts of the present case illustrate this point. The petitioner, who lived in Ohio at the time he forged the Union checks, see Tr. 16A, brought the stolen checks from Ohio into Pennsylvania. He forged them at an unknown time and place to purchase a boat and a car. Requiring prosecutors to prove on which side of the border the petitioner forged the checks, when in fact the petitioner had transported the forged checks in continuation of a longer interstate journey, serves no purpose. In addition, as the supporters of the Dyer Act recognized, federal authority may be necessary to investigate fully the crime and to compel witnesses from other States to testify. See 58 Cong. Rec. 5475 (1919) (remarks of Rep. Newton) ("all the witnesses from anywhere in the United States can be compelled to appear and testify [before the grand jury], and a full and complete investigation can be had in every case, and when a case is called for trial, the barrier of the State line having been swept away, the witnesses will be compelled to appear and testify in open court"). Absent federal jurisdiction, it may have been impossible, or at the least extraordinarily difficult, to compel Union and bank officials from Ohio to testify in a Pennsylvania state court that the checks had been stolen, when they had been stolen, when the bank account had been closed, that the signature on the checks had been forged, and that the petitioner had no authority to write those checks.

There is no foundation for the fear expressed in the dissenting opinion that our decision today is a broad expansion of federal jurisdiction in criminal law. Post, at 660. The implications of this case are limited by the facts and its holding that the forged check was transported in interstate commerce only because that transportation was a continuation of a longer journey that began out of state. If the entire transaction—obtaining and forging the checks, purchasing the car and boat, and returning the checks to the bank for collection—had occurred solely within Ohio, it seems clear that the checks would not have been "transport[ed] in interstate commerce." In light of today's limited holding, the dissent's suggestion that we are overburdening limited federal prosecutorial resources, post, at 674, is misplaced.

moreover, the petitioner's construction produces the anomalous result that no federal crime would have been committed in this case until the *victims* returned the forged checks to the out-of-state drawee bank for payment. Brief for United States 18, n. 11.[20] While Congress could have written the statute to produce this result, there is no basis for us to adopt such a limited reading.[21]

---

[20] See also *Pereira* v. *United States*, 347 U. S. 1, 9 (1954) (holding that since the fraudulently obtained checks had to be sent to an out-of-state bank for collection, the petitioner was guilty of violating § 2314 because he "'caused' [the check] to be transported in interstate commerce").

[21] The cases cited by the petitioner in support of his position do not dissuade us from our conclusion, for none of the cases based its holding on an analysis of the language, legislative history, or purpose of § 2314. In *United States* v. *Owens*, 460 F. 2d 467, 469 (CA5 1972), for example, the court simply quoted the pertinent language of § 2314 and held, without analysis or citation to authority, that it "is obvious that to prove the commission of an offense under this portion of section 2314 the Government must show that the instrument traveled interstate in its forged or altered condition." See *United States* v. *Hilyer*, 543 F. 2d 41, 43 (CA8 1976) (citing only *Owens* for the proposition that § 2314 requires proof that the security was forged before crossing state lines); *United States* v. *Sparrow*, 635 F. 2d 794, 796 (CA10 1980) (en banc) (citing only *Owens* and *Hilyer* for its holding that "the plain meaning of [§ 2314] requires the prosecution to show that the security was in a forged or altered condition at the time of its interstate passage"), cert. denied, 450 U. S. 1004 (1981).

We note that our holding today is consistent with other cases construing similar federal statutes designed to combat theft in the channels of interstate commerce. In *United States* v. *Ajlouny*, 629 F. 2d 830 (CA2 1980), cert. denied, 449 U. S. 1111 (1981), the court reviewed a challenge to a conviction under the "foreign commerce" aspect of the first paragraph of § 2314 (transportation of stolen goods in interstate or foreign commerce). In that case, the defendant had been arrested shortly before he shipped stolen telephone equipment from New York to Doha, Qatar. The court rejected the defendant's claim that no federal offense had occurred because no international boundary had been crossed, holding that "Congress was not aiming only at stolen goods moving across a technical boundary line, but also wanted to reach shipments in the course of such a crossing." 629 F. 2d, at 837.

In *Barfield* v. *United States*, 229 F. 2d 936 (CA5 1956), the defendant challenged his conviction under 18 U. S. C. § 2312, which prohibits the in-

## B

The petitioner argues alternatively that even if a reading of § 2314 does not clearly support his interpretation, the provision is ambiguous and the ambiguity should be resolved by reading the provision narrowly to require the checks to have been forged before crossing the state line. For support, the petitioner cites *United States* v. *Bass*, 404 U. S. 336 (1971), where this Court considered a challenge to a conviction under 18 U. S. C. App. § 1202(a), which prohibits a convicted felon from "receiv[ing], possess[ing], or transport[ing] in commerce or affecting commerce . . . any firearm." The issue

---

terstate transportation of stolen vehicles, using the same "interstate commerce" language as used in § 2314. See n. 2, *supra*. The court rejected the defendant's argument that the Government's failure to show that he had driven the car across a state border required acquittal. "[A]ny driving, whether wholly within the state of origin, state of destination, or from and to, if done as a substantial step in the furtherance of the intended interstate journey is, we think, within the act." 229 F. 2d, at 939. See *United States* v. *Lambert*, 580 F. 2d 740, 743 (CA5 1978).

Cases reviewing other statutes, with slightly different "interstate commerce" provisions, arrive at the same result that we reach today. In *United States* v. *Tobin*, 576 F. 2d 687 (CA5), cert. denied, 439 U. S. 1051 (1978), the defendants were convicted of receiving and conspiring to sell stolen goods "moving as, or which are a part of, or which constitute interstate . . . commerce" in violation of 18 U. S. C. § 2315. The court rejected the defendants' argument that the stolen goods had been taken out of interstate commerce by coming to rest, holding that "[s]o long as its movement within the destination state can be considered a continuation of the movement that began out of state the prerequisite of 18 U. S. C. § 2315 is satisfied." 576 F. 2d, at 692. See *United States* v. *Luman*, 624 F. 2d 152, 155 (CA10 1980) (18 U. S. C. § 2315); *United States* v. *Licavoli*, 604 F. 2d 613, 624–625 (CA9 1979) (18 U. S. C. § 2315), cert. denied, 446 U. S. 935 (1980); *United States* v. *Garber*, 626 F. 2d 1144, 1148 (CA3 1980) (construing similar language in 18 U. S. C. § 659, the court held that "[d]elays enroute do not deprive shipments of continued characterization as interstate or foreign so long as the goods have not yet reached their destination"), cert. denied, 449 U. S. 1079 (1981); *United States* v. *Maddox*, 394 F. 2d 297, 299–300 (CA4 1968) (18 U. S. C. § 659); *United States* v. *Hiscott*, 586 F. 2d 1271, 1274 (CA8 1978) (18 U. S. C. § 2313); *United States* v. *Goble*, 512 F. 2d 458, 469 (CA6 1975) (18 U. S. C. § 2313).

framed by the Court was whether "in commerce or affect-
ing commerce" modified "possesses" as well as "transports,"
since the respondent, a convicted felon, had been charged
with possession of a shotgun, but the Government had made
no effort to show that he had possessed the firearm "in com-
merce or affecting commerce." The Court found both the
language of the provision and its legislative history ambigu-
ous on this question, and decided on two grounds to read the
statute narrowly, that is, to read "in commerce or affecting
commerce" as modifying "possesses" as well as "transports."
The Court reasoned that ambiguity concerning the reach of a
criminal statute should be resolved by reading the statute
narrowly in order to encourage Congress to speak clearly,
thus giving the populace "fair warning" of the line between
criminal and lawful activity, and in order to have the Leg-
islature, not the courts, define criminal activity. *Id.*, at
347–348. Also, absent a clear statement of purpose from
Congress, the Court was unwilling to read a federal criminal
statute in a way that would encroach on a traditional area of
state criminal jurisdiction.

The present case, however, does not raise significant ques-
tions of ambiguity, for the statutory language and legislative
history of the Dyer Act indicate that Congress defined the
term "interstate commerce" more broadly than the petitioner
contends. We hold that Congress intended to use the term
"interstate commerce" as this Court had been using it in
Commerce Clause cases before 1919. As we observed in
*United States* v. *Bramblett*, 348 U. S. 503, 509–510 (1955),
although "criminal statutes are to be construed strictly . . .
this does not mean that every criminal statute must be given
the narrowest possible meaning in complete disregard of the
purpose of the legislature" (footnote omitted).[22]

---

[22] We reject the petitioner's suggestion that our holding today reads
§ 2314 as if Congress intended to "expand the authority of the Federal Gov-
ernment over the entire field of criminal fraud." Brief for Petitioner 23.
Rather, our holding is consistent with the expressed congressional purpose

## III

Through § 2314, Congress has sought to aid the States in their detection and punishment of criminals who evade state authorities by using the channels of interstate commerce. Based on this congressional purpose, the trial judge in the present case correctly instructed the jury that they could find the petitioner guilty of violating § 2314 if they found that the forgeries occurred during the course of interstate commerce, which includes a "continuation of a movement that began out of state," even though movement of the forged checks was restricted to one State. Accordingly, we affirm the judgment of the court below.

*So ordered.*

JUSTICE STEVENS, dissenting.

The words "transportation in interstate or foreign commerce" appear in a host of federal criminal statutes.[1] These statutes prohibit the interstate transportation of stolen motor vehicles, forged checks, prostitutes, explosives, obscene materials, kidnap victims, counterfeit phonograph records, and numerous other items. In all of these statutes the predicate for federal jurisdiction might reasonably be identified in either of two ways: first, as I read the statutory language, it might require that the subject be transported

_____

to apprehend forgers who use state boundaries to evade detection and punishment by state authorities. Had the petitioner not used interstate channels to pass his forged checks, he would not have been subject to punishment under § 2314.

[1] See, *e. g.*, 18 U. S. C. § 844(d) (explosives); 18 U. S. C. § 924(b) (1976 ed., Supp. IV) (firearms); 18 U. S. C. § 1201(a)(1) (1976 ed., Supp. IV) (kidnaping); 18 U. S. C. § 1231 (strikebreaking); 18 U. S. C. § 1301 (lotteries); 18 U. S. C. § 1465 (obscenity); 18 U. S. C. §§ 2251, 2252 (1976 ed., Supp. IV) (sexual exploitation of children); 18 U. S. C. § 2312 (stolen motor vehicles and aircraft); 18 U. S. C. § 2314 (other stolen property); 18 U. S. C. § 2318 (1976 ed., Supp. IV) (counterfeit phonograph records); 18 U. S. C. § 2421 (prostitution); 18 U. S. C. §§ 2511(1)(b)(iii), 2512(1) (electronic eavesdropping).

across a state line; second, as the Court reads this language, it may merely require that the subject be transported during an interstate journey.

In this case the evidence indicates that petitioner transported stolen checks from Ohio into Pennsylvania. We must assume, because of insufficient contrary evidence, that petitioner did not forge the checks until he was on the Pennsylvania side of his interstate journey. The Court holds that this evidence proves a violation of 18 U. S. C. § 2314, which in pertinent part proscribes the transportation in interstate commerce of forged checks.[2] According to the Court, a forged check is transported in interstate commerce as long as the check was in a forged condition at some point during the defendant's journey from one State to another. Consistent with this rationale, it was not even necessary that the Government proved that the checks crossed state lines.[3] Under the Court's analysis, petitioner would have violated § 2314 if he had left his home in Ohio, picked up a forged check in Pittsburgh, and negotiated it in Beaver Falls.[4]

If the Court's reading of this language is consistently applied to all of the statutes in which the same jurisdictional predicate appears, this is an extremely important case. If the Court's holding is limited to the situation in which a check has been carried across a state line and then forged in the

---

[2] Section 2314 also requires proof that the defendant knew that the transported checks were forged. This element is not at issue here.

[3] The instructions of the trial court required proof that the check had moved from Ohio to Pennsylvania, see *ante*, at 645–646, n. 6, but the Court's interpretation of the statute would apply equally to a forged check picked up in the destination State. For the Court the test is whether there was "movement" of the contraband "within the destination State." *Ante*, at 648. The Court of Appeals' position is unclear. See 644 F. 2d 274, 282, n. 1 (CA3 1981) (Garth, J., concurring and dissenting).

[4] Likewise, a transcontinental hitchhiker who stole a car in Pittsburgh and abandoned it in Philadelphia would have violated the Dyer Act.

destination State, the holding is not very significant. Although it would be illogical to limit the holding in that way, a review of the relevant legislative history will demonstrate that the holding should not be extended to its logical conclusion. That review also demonstrates, I believe, that today's holding does not faithfully reflect the intent of Congress.

## I

"[T]he issue in the present case is the meaning that Congress ascribed to the phrase 'interstate commerce' in § 2314." *Ante*, at 647, n. 9. More specifically, the question is "whether the statutory phrase 'interstate commerce' comprehends movement of a forged security [wholly] within the destination State," *ante*, at 648, or whether petitioner is correct that Congress intended "to limit the reach of that provision to those persons who transport forged securities across state lines," *ante*, at 647. For the answer to this question, the Court correctly looks to the legislative history of § 3 of the Dyer Act, the precursor of § 2314. The interstate commerce language that was enacted as § 3 of the Dyer Act in 1919 has been retained in § 2314; for our purposes, the subsequent enactments in 1934 and 1939 merely expanded the coverage of § 3 to other types of stolen property and to forged securities, respectively.

Section 3 of the Dyer Act proscribes, in accurate paraphrase, the transportation in interstate commerce of stolen motor vehicles. See 41 Stat. 325. The phrase, standing alone, admittedly is ambiguous. It is clarified by § 2(b) of the same statute, which provides that "[t]he term 'interstate . . . commerce' as used in this Act shall include transportation from one State . . . to another State." *Ibid.* Any lingering ambiguity is dispelled by the legislative history.

The problem that gave rise to the legislation, the House Judiciary Committee reported, was that "[t]hieves steal automobiles and take them from one State to another and oft-

times have associates in this crime who receive and sell the stolen machines." H. R. Rep. No. 312, 66th Cong., 1st Sess., 1 (1919) (hereafter H. R. Rep. No. 312). In a discussion of congressional power under the Commerce Clause, the Committee manifested its intention to proscribe only this problem: "The power of the Congress to enact this law and to punish the theft of automobiles in one State and the removing of them into another State can not be questioned," *id.*, at 3; "[n]o good reason exists why Congress, invested with the power to regulate commerce among the several States, should not provide that such commerce should not be polluted by the carrying of stolen property from one State to another," *id.*, at 4. In introducing the bill to the House, Representative Dyer opened his remarks by stating that "this bill is for the purpose of providing punishment for those stealing automobiles and automobile trucks and taking them from one State to another State." 58 Cong. Rec. 5470 (1919). He described §§ 3 and 4 of the Act, the precursors of 18 U. S. C. §§ 2314 and 2315, as follows:

> "It provides, gentlemen, for only two things. Section 3 provides for the punishment of a thief stealing a car and transporting it from one State to another. Section 4 provides for the receipt of the stolen car by thieves in another State for the purpose of selling and disposing of it." 58 Cong. Rec. 5472 (1919).

Representative Igoe stated that "[t]he offense sought to be reached in the act is the transportation, the taking it across the line, taking it from one State to another." *Id.*, at 5473. Senator Cummins, in introducing the House bill to the Senate, described its purpose to be "to punish the transportation of stolen motor vehicles in interstate or foreign commerce." *Id.*, at 6433. He explained:

> "I want Senators to know what the bill is. The favorite place for such thefts is near a State line, where vehicles are carried quickly across the State line, and there is

very great difficulty in securing the punishment of the offender. The bill is for the purpose of giving the Federal courts jurisdiction for the punishment of such an offender." *Ibid.*[5]

Representative Bee, like Representative Reavis, objected to the bill because it "single[d] out automobiles" for special treatment. *Id.*, at 5473. Representative Reavis stated that he would "be very glad indeed to vote for a bill making it a felony to transport stolen property of any kind from one State to another." *Ibid.*

The Court's expansive interpretation of the interstate commerce phrase in § 3 of the Dyer Act is far broader than any that was expressed by the Committees and the Members of the 66th Congress. The Court offers several reasons for its reading of the statute, but none withstands analysis.

## A

The Court first reasons that, by using the phrase "transportation in interstate commerce of stolen motor vehicles" in the statute, Congress must have intended to proscribe more than the "transportation across state lines of stolen motor vehicles" or the "interstate transportation of stolen motor vehicles." The Court's reasoning from the text, however, is flawed in two respects.

First, the House Report and the Members of Congress who described the Dyer Act proscription as the "interstate

---

[5] Later, Senator Cummins further described the House bill:

"The practice is to steal an automobile close to a State line and run it across the State line. The first section is intended to punish anyone who does that thing, knowing the vehicle to have been stolen. The further practice is, if possible, to dispose of the vehicle to some other party, confederate or otherwise, when it gets across the State line, and section 4 is for the purpose of punishing a man who barters or sells or disposes of the property with intent to deprive the owner of the possession thereof, or if he conceals it knowing it to have been stolen. I think that would probably embrace every case that could be reached." 58 Cong. Rec. 6434 (1919).

transportation of stolen motor vehicles," or some such phrase focusing on state lines, used these phrases interchangeably with the phrase "transportation in interstate commerce of stolen motor vehicles," which was the formulation included in the proposed and enacted bill. The point is illustrated by Representative Dyer's descriptions of the interstate commerce element of the bill. For example, the final paragraph of the House Report that he submitted begins with the sentence, "The purpose of the proposed law is to suppress crime in interstate commerce." H. R. Rep. No. 312, at 4. Two sentences later, however, the Report urges that Congress, pursuant to its power to regulate commerce, should "provide that such commerce should not be polluted by the carrying of stolen property from one State to another." *Ibid.* Representative Dyer opened his remarks to the House with the statement that "this bill is for the purpose of providing punishment for those stealing automobiles and automobile trucks and taking them from one State to another State." 58 Cong. Rec. 5470 (1919). It is inconceivable that Representative Dyer or any of the other legislators who used interchangeably the various phrases[6] nevertheless intended the statutory formulation "transportation in interstate commerce of stolen motor vehicles" to mean any more than "interstate transportation of stolen motor vehicles" or "transportation across state lines of stolen motor vehicles" or "transportation of stolen motor vehicles from one State to another."

The second flaw in the Court's textual analysis is its reference to 18 U. S. C. § 10 for the definition of "interstate commerce." See *ante*, at 648–649. Section 10 provides that "[t]he term 'interstate commerce', as used in this title, includes commerce between one State . . . and another State." It merits reiteration, however, that "interstate commerce" is defined much more narrowly in the Dyer Act and the Na-

---

[6] See, *e. g.*, *id.*, at 5472–5473 (Rep. Reavis); *id.*, at 5473 (Rep. Igoe); *id.*, at 5474–5476 (Rep. Newton); *id.*, at 6433–6434 (Sen. Cummins).

tional Stolen Property Act of 1934. Section 2(b) of the Dyer Act provides that the term "shall include *transportation* from one State . . . to another State." 41 Stat. 325 (emphasis added). Section 2(a) of the 1934 enactment provides that the term "shall *mean* transportation from one State . . . to another State." 48 Stat. 794 (emphasis added). When Congress revised the Federal Criminal Code in 1948, it consolidated several definitions of "interstate commerce" into § 10. The Reviser's Notes state only that, "[i]n addition to slight improvements in style, the word 'commerce' was substituted for 'transportation' in order to avoid the narrower connotation of the word 'transportation' since 'commerce' obviously includes more than 'transportation.'" Notes following 18 U. S. C. § 10. For purposes of divining the intent of Congress in enacting the Dyer Act in 1919, the National Stolen Property Act in 1934, and the amendments thereto in 1939, we must refer to the definition by which those Congresses understood the reach of those criminal statutes.

## B

There is a logical explanation—albeit an unarticulated one—for Congress' use of the arguably broader formulation in the statute when its intent was so clearly less ambitious. This explanation is derived from the part of the legislative history in which the constitutionality of the proposed Dyer Act was justified by reference to this Court's expositions of the scope of congressional power under the Commerce Clause. The Court infers from one such part of the legislative history that "Congress intended the statutory phrase to be as broad as this Court had used the phrase in Commerce Clause decisions before 1919." *Ante*, at 653. If the legislative history is examined through 1919 lenses instead of from a distance of six decades, however, the only supportable conclusion is that Congress used the phrase "interstate commerce" merely to indicate the source of its authority to pro-

scribe conduct that had previously been regulated solely by the States.

In the Court's words, the House Report "justif[ied] Congress' authority to enact the Dyer Act by reference to this Court's decisions holding that Congress has plenary power under the Commerce Clause to regulate interstate commerce." *Ante*, at 652. From this discussion in the House Report, the Court draws the conclusion that Congress meant to adopt as the definition of the *statutory* term this Court's construction of the *constitutional* term "interstate commerce." That conclusion does not logically follow from its premise and is without any support in the legislative history.

The part of the House Report cited by the Court begins with this paragraph:

> "The power of the Congress to enact this law and to punish the theft of automobiles in one State and the removing of them into another State can not be questioned, in view of laws of similar nature heretofore enacted by Congress and the decisions of the Supreme Court of the United States touching same." H. R. Rep. No. 312, at 3.

This statement establishes that (1) the objective of the statute was to proscribe the transportation of a stolen automobile from one State to another, and (2) the House Judiciary Committee was confident that this objective could be accomplished under the Commerce Clause, as interpreted by this Court. The Report's discussion of this Court's decisions justifies the Committee's confidence in the constitutionality of the Act. Indeed, the penultimate paragraph of the Report explains just how far Congress can act under the Commerce Clause;[7] in the paragraph's closing sentence, which the

---

[7] "Congress has enacted various laws for the regulation of interstate commerce which have uniformly been sustained by the courts. Among them are those relating to the use of safety appliances, hours of labor of employees, monthly reports of accidents, arbitration of controversies between railroads and their employees, the exclusion of impure goods and lot-

Court quotes, *ante*, at 650, the Report states that even "[l]arceny of goods from railroad cars being transported in interstate commerce has . . . been declared a crime by act of Congress." H. R. Rep. No. 312, at 4. But the Committee had a much more limited objective in proposing the Dyer Act. In the closing paragraph of the Report, it expressly linked its discussion of this Court's Commerce Clause cases with the statutory objective: "No good reason exists why Congress, invested with the power to regulate commerce among the several States, should not provide that such commerce should not be polluted by the carrying of stolen property from one State to another." *Ibid.*

The Committee's confidence in the constitutionality of the Act was not shared by all Members of Congress. Representative Newton described in detail the practice of automobile thieves of stealing cars and driving them across state lines where they could not be pursued by the police of the first State. See 58 Cong. Rec. 5474–5475 (1919). After summarizing the need for federal legislation,[8] he turned to the question of its constitutionality:

---

tery tickets, employers' liability, etc. Specific reference may be made to the interstate commerce act, wherein interstate commerce railroads are forbidden to form combinations or pools for the maintenance of rates, and also the antitrust act of July 2, 1890, wherein every contract combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several States was declared a crime, and made punishable as such. Larceny of goods from railroad cars being transported in interstate commerce has also been declared a crime by act of Congress." H. R. Rep. No. 312, at 4.

[8] "That there is a crying need for relief from this rapidly growing evil there can be no question. That the States have been unable to effectively deal with the problem has been fully demonstrated. I have no doubt but that 90 per cent of the cars that are stolen and not recovered cross State lines before they are disposed of. The use which the automobile thief is making of interstate commerce takes him into a sphere which is beyond the reach of State control, and into a field where he can operate with security and where he will continue to do so until Congress asserts its power by the passage of a bill such as the one now under consideration." 58 Cong. Rec. 5475 (1919).

"But it has been seriously argued by Members of this House that Congress has no power to pass such a law; that such legislation is an invasion of the rights of the States. But if you will study the laws upon kindred subjects heretofore enacted by Congress and will read the decisions of the courts sustaining such laws I do not believe that a doubt will remain in the mind of even the most ardent States-rights advocate as to the powers of Congress upon this subject." *Id.*, at 5475.

Representative Newton discussed a number of court decisions and repeatedly compared the federal laws therein upheld with the bill Congress was considering:

"In the face of the decisons which I have just read, can there be any question but what an automobile which is stolen in one State and transported across a State line into another State for the purpose of yielding a profit to the person transporting the same constitutes 'interstate commerce'? . . .

.      .      .      .

"Thus it will be observed that no particular vehicle of transportation is necessary in order to make the article transported interstate commerce, nor is it necesary that the article should be transported for any specific purpose. All that is necessary for it to become interstate commerce is that it shall be transported from one State to another, even though it be live stock driven on foot.

.      .      .      .      .

"If the driving of diseased cattle from one State to another is interstate commerce, as held in the decision just cited, and as held by the Supreme Court of the United States in the case of Railroad v. Hus[e]n (95 U. S., 465), then the driving of a stolen automobile from one State to another certainly falls within the meaning of that term.

.      .      .      .      .

"If the transportation of a woman from one State to another, by means of an automobile, for prostitution, constitutes interstate commerce, then how can it be argued, with any show of color, that the driving of a stolen automobile from one State to another for profit is not interstate commerce?" *Id.*, at 5475–5476.

Given these statements in the legislative history and the absence of any indication that any legislator intended the Dyer Act to proscribe more than the transportation of stolen automobiles from one State into another, it is manifest that Congress used the term "interstate commerce" and referred to this Court's decisions construing the Commerce Clause simply to articulate the source of its authority to proscribe the interstate transportation of stolen automobiles. The Court's suggestion that Congress incorporated into the statute the constitutional definition of "interstate commerce" is quite implausible.

## C

The final leg of the Court's analysis of the legislative history is the following colloquy between Representatives Anderson and Dyer:

"Mr. ANDERSON. I will ask the gentleman whether the committee meant the same thing in its definition of interstate commerce in section 2 as it meant in section 4?

"Mr. DYER. I think so. If the gentleman will point out wherein it differs, I shall be glad.

"Mr. ANDERSON. In the definition under section 2 interstate commerce means transportation from one State to another, while if you refer to section 4 you find there you have a vehicle or motor car constituting interstate or foreign commerce, and you scarcely have a sensible section.

"Mr. DYER. I will say to the gentleman that if there is any difference there, which I do not see, the matter

would be construed by the Supreme Court, which has passed many times upon what is meant by interstate and foreign commerce. I think it really is not necessary to put the definition in this bill. It was done at the request of some of the members of the committee. The Supreme Court has decided many times what is interstate commerce. I do not think myself that any definition is necessary." *Id.*, at 5472.

Since the Court places so much reliance upon Representative Dyer's answer, see *ante*, at 650–652, a careful parsing is necessary. Section 2(b) of the bill provided that "[t]he term 'interstate . . . commerce,' as used in this Act, shall include transportation from one State . . . to another State." 41 Stat. 325. Section 4 of the bill proscribed the receipt, concealment, storage, bartering, sale, or disposition of any stolen motor vehicle "moving as, or which is a part of, or which constitutes interstate . . . commerce." *Ibid.* Representative Anderson's confusion is understandable: § 2 defined interstate commerce in terms of interstate transportation; § 4, however, seemed to indicate that the automobile itself constituted interstate commerce, apart from the transportation of it.[9] Representative Dyer obviously did not understand the confusion because he perceived no difference between the two sections insofar as the meaning of "interstate commerce" was concerned. He had no doubt that this Court knew what the term meant and that § 4 would be construed correctly; indeed, he saw no need for the statutory definition of "interstate commerce." Even if it could be said that Representative Dyer was willing to defer to this Court for the definition of the interstate commerce element of § 4, that is not what Congress did. The Dyer Act as proposed and as enacted in-

---

[9] This is the section that Representative Dyer had just previously described as providing for the punishment of "the receipt of the stolen car by thieves in another State for the purpose of selling and disposing of it." *Id.*, at 5472.

cluded the definition of "interstate commerce" as transportation from one State to another. Moreover, § 4, which contained the confusing reference to interstate commerce, is the precursor of § 2315, not the section the Court interprets today. The precursor of § 2314 is § 3 of the Dyer Act, which has nothing to do with Representative Anderson's confusion and Representative Dyer's answer.

Interestingly, another colloquy, this one between Representatives Hastings and Saunders, also indicates the confusion about the meaning of § 4 of the bill:

> "Mr. HASTINGS. I want to direct the gentleman's attention to section 4. Suppose an automobile is stolen, say, in the State of Virginia at some one point and is transported to some other point in the State of Virginia and sold to some one there who knows that property to have been stolen, would that be a Federal offense under section 4?
>
> "Mr. SAUNDERS of Virginia. I think not. How would it be? Up to that point what has been done has not reached the dignity of a Federal offense. The Federal offense begins when there is a movement in interstate commerce.
>
> "Mr. HASTINGS. Section 4 provides that anyone receiving stolen property knowing it to have been stolen, and it does not require it to have gone across State lines, as you will perceive if you read section 4 closely.
>
> "Mr. SAUNDERS of Virginia. The gentleman did not read the language in line 10, which says:
>
>> Moving as, or which is a part of, or which constitutes interstate or foreign commerce.
>
> "And that answers the difficulty of the gentleman from Oklahoma." 58 Cong. Rec. 5477 (1919).

Immediately after this colloquy, Representative Dyer asked for a vote, and the House passed the bill. If we were construing § 2315, which is the successor to § 4 of the Dyer Act,

then this colloquy would seem to indicate that § 4 requires the automobile to have crossed state lines, notwithstanding the confusing reference to "interstate commerce" in that section and Representative Dyer's answer to Representative Anderson's observation. In any event, we are not construing § 2315, but § 2314, and the definition of "interstate commerce" included in the Dyer Act, as well as the statute's legislative history, clearly indicates that § 3, the precursor of § 2314, proscribed only the transportation across state lines of stolen automobiles.

## II

The National Stolen Property Act, enacted in 1934, merely extended the Dyer Act to the transportation in interstate commerce of other types of stolen property.[10] The Act was passed with little debate, but its legislative history confirms the points made above. As they did in 1919, the Committees and Members of Congress used the phrase "transportation in interstate commerce of stolen property" interchangeably with such phrases as "interstate transportation of stolen property" or "transportation across state lines of stolen property." The Senate Judiciary Committee Report described the Dyer Act as "concerned [with] interstate transportation of stolen motor vehicles." S. Rep. No. 538, 73d Cong., 2d Sess., 2 (1934). The House Judiciary Committee Report stated that "[t]his bill is designed to punish interstate transportation of stolen property, securities, or money." H. R. Rep. No. 1462, 73d Cong, 2d Sess., 2 (1934). It also noted

---

[10] In the 1934 National Stolen Property Act, Congress adopted a slightly different definition of "interstate commerce" than the one included in the 1919 Dyer Act. Section 2(b) of the Dyer Act provides that the term shall *include* transportation from one State to another State, whereas § 2(a) of the 1934 enactment provides that the terms shall *mean* transportation from one State to another State. There is no reason to believe that one definition was intended to be any broader than the other. But see the Court's curious discussion, *ante,* at 650–652, n. 14.

that "[p]revious Congresses have considered bills providing punishment for interstate shipment of stolen property." *Ibid.* Senator Ashurst told the Senate: "Gangsters who now convey stolen property, except vehicles, across the State line, with that immemorial gesture of derision, thumb their nose at the officers. This bill extends the provisions of the [Dyer Act] to other stolen property described in the bill." 78 Cong. Rec. 6981 (1934). Also like the legislative history of the Dyer Act, the Reports in 1934 substantiated the constitutionality of the enactment, this time by reference to the decisions upholding the Dyer Act. See S. Rep. No. 538, *supra,* at 2; H. R. Rep. No. 1462, *supra,* at 2.

The Reports made an additional point that merits consideration. The Department of Justice, in a memorandum reprinted in the Senate Report, explained the troubles that previous attempts at extending the Dyer Act to other stolen property had faced:

> "The explanation for the opposition to federalizing such crimes was in the concern which had developed at that time over the burdening of the Federal machinery for administering criminal justice. It was for this reason also that the Senate failed to pass a similar bill in 1930. The heavy burden placed on the Federal Government by the Dyer Act, which concerned interstate transportation of stolen motor vehicles, had then become apparent." S. Rep. No. 538, *supra,* at 2.

The Senate bill therefore limited federal jurisdiction to cases involving stolen property worth $1,000 or more. The House increased the limit to $5,000, with this explanation:

> "It is believed that it would place too great a burden on the Department of Justice to ask it to undertake to apprehend and prosecute every person violating the substantive provisions of such a law without regard to the amount of property involved. The minimum valuations

fixed in the bill required to give the Federal Government jurisdiction are the figures asked and recommended by the Attorney General." H. R. Rep. No. 1462, *supra*, at 2.

The Senate acceded to the increase. The point to be made is that Congress recognized that federal law enforcement authorities had limited resources. This recognition makes it all the more likely that Congress did not intend in 1934 to extend its proscription beyond the interstate transportation of stolen property.

## III

Quoting from *United States* v. *Sheridan*, 329 U. S. 379, 384, the Court declares that "in [enacting] § 2314 Congress 'contemplated coming to the aid of the states in detecting and punishing criminals whose offenses are complete under state law, but who utilize the channels of interstate commerce to make a successful getaway and thus make the state's detecting and punitive processes impotent.'" *Ante*, at 654. Ironically, this quote actually refutes the Court's position. The Court assumes, as it must, that the state offense committed by petitioner—forging a check—was committed in Pennsylvania rather than in Ohio, from which petitioner commenced his interstate journey. This is not a case, therefore, in which the defendant's offense was complete under state law before he crossed state lines to make his getaway. Rather, this is a case in which the defendant crossed state lines and then committed the underlying state offense.[11] It is even more ironic that, although the issue of the meaning of the interstate commerce phrase of § 2314 was not before the Court in *Sheridan*, the Court thrice referred to that element as the "interstate transportation" of forged securities. See 329 U. S., at 384, 385, 387. Remarkably, the Court today places so much significance upon the statutory formulation of the in-

[11] The evidence does not indicate where petitioner traveled after the forgeries.

terstate commerce element of § 2314 even though in referring to that element the Committees and Members of the 1919 and 1934 Congresses, as well this Court in *Sheridan*, repeatedly used the formulation that the Court rejects today as too narrow.

## IV

The petitioner's argument that he was prosecuted and convicted under the wrong statute may generate little sympathy.[12]   Our primary concern, however, is not with the fate of this defendant.   Rather, our concern is to identify the scope of the Federal Government's responsibility for law enforcement.   That scope is a matter for Congress to determine. In this case, it is clear to me that the Court has allowed the prosecutor to encroach into an area of state responsibility and to cross a line that Congress has drawn.   I therefore respectfully dissent.

---

[12] Petitioner concedes that he violated 18 U. S. C. § 2315, the successor to § 4 of the Dyer Act.   See Tr. of Oral Arg. 11.   Petitioner might also have violated other paragraphs of § 2314.   See 644 F. 2d, at 285 (Higginbotham, J., concurring in part and dissenting in part); Tr. of Oral Arg. 18.