UNITED STATES of America

v.

Mattie Doll SIMMONS, Appellant.

UNITED STATES of America

v.

Maurice BROWN, Appellant.

Nos. 81–1613, 81–1877.

United States Court of Appeals,
Third Circuit.

Argued Feb. 16, 1982.

Decided May 14, 1982.

Rehearing and Rehearing In Banc Denied
June 8, 1982.

William W. Robertson, U.S. Atty., Samuel Rosenthal, Asst. U.S. Atty. (argued), Newark, N. J., for appellee.

Peter W. Till (argued), Stephen R. Fogarty, Aron, Till & Salsberg, Jersey City, N. J., for appellant, Mattie Doll Simmons.

Philip Rosenbach (argued), Lowenstein, Sandler, Brochin, Kohl, Fisher & Boylan, A Professional Corp., Roseland, N. J., for appellant, Maurice Brown.

Before ADAMS and SLOVITER, Circuit Judges, and VAN ARTSDALEN,* District Judge.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

### I.

The principal issue on this appeal is whether evidence of a comprehensive scheme to negotiate checks bearing forged signatures is encompassed within statutory language proscribing "tak[ing] and carr[ying] away, with intent to steal or purloin" property or money belonging to a federally insured bank. 18 U.S.C. § 2113(b). We join those circuits representing the majority view and hold that such activity is covered by the statute. Finding

the defendants' remaining contentions to be without merit, we affirm their convictions.

### II.

Appellants Maurice Brown and his wife, Mattie Doll Simmons, were tried before a jury on a twenty-two count superseding indictment charging them and co-defendants, William Baucom, his wife Elizabeth, and her father Anthony Bilotti, with participating in a scheme to cash forged checks at various federally insured banks. The indictment charged all five defendants with:

(a) criminal conspiracy, in violation of 18 U.S.C. § 371 (Count 1);

(b) nine substantive counts of stealing and purloining money from federally insured banks on various occasions, in violation of 18 U.S.C. § 2113(b) (Counts 2 through 7, 14, 21, and 22); and

(c) twelve substantive counts of interstate transportation of falsely made and forged checks, in violation of 18 U.S.C. § 2314 (Counts 8 through 13, and 15 through 20).

The principal testimony was provided by Jennifer Straker and Sherry Stormes, unindicted co-conspirators, and was corroborated by substantial independent evidence, including bank photographs showing Simmons and Bilotti cashing forged checks, fingerprints of Brown and William Baucom found on various checks, and a written confession signed by Elizabeth Baucom.

The scheme worked essentially as follows: Brown purchased blank corporate checks (which had been stolen or belonged to a closed account) from William Baucom, Straker, and other sources, and purchased or obtained, usually from the Baucoms, originals or photocopies of checks drawn on personal checking accounts of third parties. The drawer's name, signature, and personal checking account number from the valid personal checks were used as the payee's name, endorsement signature, and payee

---

* Honorable Donald W. Van Artsdalen, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

account number on the blank corporate checks, which were then presented by the conspirators at the branch banks where the personal checking accounts were maintained. Some of the original or photocopies of valid personal checks were obtained by Elizabeth Baucom, who worked as a bank teller during part of the relevant period. Tr. at 2.135, 4.113, 6.110. Brown filled in the blank corporate checks, stamped them with a checkwriter machine, and forged signatures on them. On a regular basis, he drove various co-conspirators to banks to cash these checks, and waited in the car while they went inside. Straker had been recruited during the summer of 1979 by Brown who told her that he had been cashing checks with Simmons, a black woman, but that he "needed a white woman to work [with] in the white belt." Tr. at 2.99. In addition to cashing the forged checks, Straker also supplied Brown with some "New Jersey paper", *i.e.*, blank corporate checks drawn on New Jersey banks for the operation. Tr. at 2.115–2.117.

Generally, the proceeds from the operation were divided in the following manner: $10 was paid for each blank corporate check which was to be forged and negotiated, $50 or $75 was paid for the photocopied personal check from which the payee's name, signature and account number were taken, and, if Brown did not drive the check-casher to the bank, $25 was paid to the driver. The remainder of the proceeds from every check was split evenly between Brown and the person cashing the check. Tr. at 2.124, 5.173. Profits of up to $7,000 a week were made by one check-casher, and Brown made at least that amount. Tr. at 2.124–2.125.[1]

After Straker was arrested on November 5, 1979, while attempting to cash a forged check at a bank, Brown escaped detection and enlisted Stormes' participation as Straker's replacement, teaching her the operation, giving her the fraudulent checks to cash, and driving her to the banks to cash the checks. Tr. at 5.170–5.171, 5.192–5.195. Brown told Stormes that Simmons and others were involved in the operation. Tr. at 5.174. Both Straker and Stormes testified that they worked directly with Brown many times, and that they had witnessed him completing and/or forging the checks. Tr. at 2.117, 2.144–2.146, 5.170–5.171.

While in jail following her arrest, Straker agreed to cooperate with law enforcement authorities. A telephone conversation between Straker and Brown was tape recorded by the authorities, in which Brown indicated his involvement in the fraudulent check-passing scheme. Tr. at 4.59–4.82. This conversation was introduced into evidence. Also read into evidence was a redacted statement which Elizabeth Baucom had given to the FBI regarding her involvement in the scheme. It stated in part:

> About three or four weeks ago I began to Xerox checks that I handled as a teller at the United Jersey Bank at Summit and Essex Street, Hackensack, New Jersey. In all I copied about 25 checks which I took from the bank. The reason that I took these copies of the checks is because *someone else* and I agreed to do it. *This other person* had contacts with people and planned to sell each copy of a check to them for 20 or 25 dollars each. I assumed that they used them for something to do with fraudulent checks.[2]

Tr. 6.110 (emphasis added).

At trial, each substantive count of the indictment was supported by a specific fraudulent check, with the exception of

---

1. Straker testified that she and Brown "made up a work schedule," Tr. at 2.116, and "worked" an average of three or four days a week. Tr. at 2.119. She described a "typical day" of work:

   > Maurice [Brown] had picked me up in the morning, and either the work was already made up or we'd have to make it up. . . .
   >
   > .   .   .   .   .

   . . . [W]e'd take a map and more or less plan your course for the day so you could get the most amount in one day. Then we would start at one point and just keep going until the banks closed, try to get as many as possible.

   Tr. at 2.120.

2. The italicized portions of the statement, in unredacted form, originally referred to Elizabeth Baucom's husband, William Baucom.

Count 16,[3] and each fraudulent check was linked to one or more of the defendants by evidence such as: the testimony of Straker or Stormes regarding that particular check or type of check; bank surveillance camera photographs showing Simmons, Bilotti, Straker, or Stormes cashing that particular check; fingerprints of Brown, Baucom, Straker, or Stormes on that check; bank tellers' testimony identifying the check-cashers of certain checks; and/or bank records of the photocopied personal checks that were handled by Elizabeth Baucom and used as "accounts" in the operation. It was stipulated by all defendants that the checks introduced were in fact fraudulent.

The jury convicted all five defendants of the conspiracy charged in Count 1 and of various substantive counts. Brown was found guilty on all counts (with the exception of the count which had been dismissed), and Simmons was found guilty on Counts 1 through 7.[4]

## III.

### APPEAL OF MAURICE BROWN

#### A.

*Applicability of 18 U.S.C. § 2113(b)*

Nine of the counts on which Brown was convicted alleged violations of 18 U.S.C. § 2113(b), and one additional count alleged a conspiracy to violate that section. 18 U.S.C. § 2113(b) provides in relevant part that:

> Whoever takes and carries away, with intent to steal or purloin, any property or money or any other thing of value exceeding $100 belonging to, or in the care, custody, control, management, or possession of any bank, credit union, or any savings and loan association, shall be fined not more than $5,000 or imprisoned not more than ten years, or both.

Appellant argues that, at most, the only evidence of criminal activity presented to the jury showed that he and the other defendants agreed to use forged checks to withdraw proceeds from banks whose funds were insured by the Federal Deposit Insurance Corporation. He contends that this constitutes obtaining money by false pretenses and is not encompassed within the term "steal or purloin" in 18 U.S.C. § 2113(b). This narrow construction of the statutory language has been rejected by three circuits, *see United States v. Guiffre*, 576 F.2d 126, 128 (7th Cir.), *cert. denied*, 439 U.S. 833, 99 S.Ct. 113, 58 L.Ed.2d 128 (1978); *United States v. Fistel*, 460 F.2d 157, 162–63 (2d Cir. 1972); *Thaggard v. United States*, 354 F.2d 735, 736, 738 (5th Cir. 1965), *cert. denied*, 383 U.S. 958, 86 S.Ct. 1222, 16 L.Ed.2d 301 (1966). These decisions relied in the main on the Supreme Court's decision in *United States v. Turley*, 352 U.S. 407, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957); where the Court construed the Dyer Act, 18 U.S.C. § 2312, which makes it illegal for one to transport a motor vehicle in interstate commerce while knowing it to have been "stolen". The defendant in *Turley* had "borrowed" an automobile with the owner's consent and subsequently sold the automobile after crossing state lines. Defendant argued that his conduct constituted only "embezzlement" and not "stealing" which he claimed was limited to those acts constituting larceny at common law. The Court rejected the argument that the terms "stolen" and "steal" have a common law meaning that is " 'equated or exclusively dedicated to larceny' ". *Id.* at 411–12, 77 S.Ct. at 399. Instead the Court relied on dictionary definitions of "steal" and "stolen" which give these terms broader scope, and referred specifically to Black's Law Dictionary (4th ed., 1951) which stated that "steal" "may denote the criminal taking of personal property either by larceny, embezzlement, or *false pretenses*." *See id.* at 412,

---

3. The district court ruled that the check supporting Count 16 was inadmissible because it had not been sufficiently connected to the defendants, and the court dismissed Count 16 during trial.

4. Defendants Bilotti and the Baucoms fled before the jury charge and became fugitives.

77 S.Ct. at 399 (emphasis added). As the Court noted:

> "[S]tolen" and "steal" have been used in federal criminal statutes, and the courts interpreting those words have declared that they do not have a necessary common-law meaning coterminous with larceny and exclusive of other theft crimes. Freed from a common-law meaning, we should give "stolen" the meaning consistent with the context in which it appears.

*Id.* at 412–13, 77 S.Ct. at 399–400 (footnote omitted).

In arguing that the holding in *Turley* is inapplicable, Brown relies on the holding of the Ninth Circuit in *LeMasters v. United States,* 378 F.2d 262 (9th Cir. 1967), that Congress did not intend to include obtaining money by false pretenses within 18 U.S.C. § 2113(b). *Accord, United States v. Feroni,* 655 F.2d 707, 711 (6th Cir. 1981). The Ninth Circuit reached its conclusion based on its review of the legislative history of the statute. We have also reviewed that history and reach a contrary conclusion.

In 1934 Congress considered a bill introduced in the Senate "to provide punishment for certain offenses committed against banks, organized or operating under laws of the United States, or any member of the Federal Reserve System." S.2841, 73d Cong., 2d Sess., 78 Cong.Rec. 2946 (1934). This bill made bank robbery a crime by punishing anyone who "by force and violence, or by putting in fear, feloniously takes, or ... attempts to take ... any property or money" from a bank. It would also have proscribed burglary and taking and carrying away property or money from a bank "with the consent of such bank obtained by the offender by any trick, artifice, fraud, or false or fraudulent representation." 78 Cong.Rec. 5738 (1934). The bill passed the Senate on March 29, 1934 but was amended in the House of Representatives by deletion of the provisions covering burglary and taking property or money by trick, artifice, fraud, etc. *Id.* at 8132–33. The Conference Committee approved the version of the bill passed by the House of Representatives, 78 Cong.Rec. 8767, 8776 (1934), and it became law. Act of May 18, 1934, ch. 304, 48 Stat. 783.

There is no explanation in the published legislative history as to why these two sections were deleted by the House of Representatives. This bill was one of several which had been introduced as a group in the Senate and was accompanied by a letter from the Attorney General expressing concern that legislation was needed to curb "organized groups of gangsters who ... move rapidly from the scene of one crime of violence to another across State lines." 78 Cong.Rec. 2947 (1934).

On March 24, 1937, a bill "to amend the bank-robbery statute to include burglary and larceny" was introduced in the House of Representatives. H.R. 5900, 75th Cong., 1st Sess., 81 Cong.Rec. 2731 (1937). This bill retained the bank robbery offense provision of the 1934 act without change, but added two new offenses to the bank robbery statute. First, it prohibited burglary of a bank and second, it made it a crime for anyone to "take and carry away, with intent to steal or purloin, any property or money or any other thing of value belonging to ... any bank." 81 Cong.Rec. 5376 (1937); H.R.Rep.No.732, 75th Cong., 1st Sess. (1937). The bill was thereafter amended in the House of Representatives to differentiate the "steal or purloin" offense from the other two offenses, bank robbery and bank burglary. As amended, the bill provided less severe penalties for the "steal or purloin" offense, and made a further distinction based upon the value of the property stolen or purloined. Thus, the bill as amended stated that "whoever shall take and carry away, with intent to steal or purloin, any property or money or any other things of value exceeding $50, belonging to ... any bank, shall be fined not more than $5,000 or imprisoned not more than 10 years, or both," but that someone who had similarly stolen or purloined bank property or money not exceeding $50 could only be fined a maximum of $1,000, or imprisoned for up to one year, or both. 81 Cong.Rec. 5376–77 (1937). This bill, as so amended, passed the House of Representatives on June 7, 1937. *Id.*

On August 19, 1937, the Senate accepted and passed the House version of the bill. No further changes were made, 81 Cong. Rec. 9331, 9198 (1937), and the bill, entitled "AN ACT To amend the bank-robbery statute to include burglary and larceny," became law. Act of August 24, 1937, ch. 747, 50 Stat. 749. The "steal or purloin" offense provision in the 1937 act is identical for all relevant purposes to the present subsection (b) of 18 U.S.C. § 2113.[5]

There is very little legislative history behind the 1937 statute. The two-page House Judiciary Committee report states in relevant part: "The Attorney General has recommended the enactment of this proposed legislation which is designed to enlarge the scope of the bank robbery statute, enacted in 1934, ... to include larceny and burglary of the banks protected by this statute." H.R.Rep.No.732, 75th Cong., 1st Sess. 1 (1937). A letter from the Attorney General was made part of the House report and reprinted in full. It stated in part:

> The fact that the statute is limited to robbery and does not include larceny and burglary has led to some incongruous results. A striking instance arose a short time ago, when a man was arrested in a national bank while walking out of the building with $11,000 of the bank's funds on his person. He had managed to gain possession of the money during a momentary absence of one of the employees, without displaying any force or violence and without putting any one in fear—necessary elements of the crime of robbery—and was about to leave the bank when apprehended. As a result, it was not practicable to prosecute him under any Federal statute.
>
> The enclosed bill which has been drafted in this Department proposes to amend ... the above-mentioned statute so as to include within its prohibitions, the crimes of burglary and larceny of a bank covered by its provisions.

Id. at 1–2. The two-page Senate Judiciary Committee report expressly adopted most of the House report verbatim. S.Rep.No. 1259, 75th Cong., 1st Sess. (1937). The House floor discussion of the bill is similarly unhelpful.[6]

There is no discussion of the term "steal or purloin" anywhere in the published legislative history of the 1937 Act. The Ninth Circuit in LeMasters relied primarily on the deletion in 1934 of the language expressly referring to obtaining money by fraudulent representation for its restrictive interpretation of the language of § 2113(b). The court differentiated the Dyer Act, which was the subject of the Supreme Court's Turley decision, from § 2113(b) and stated: "We are aware of no background of evil at which Congress was pointing the statute except the evil of interstate operation of gangster bank robbers." 378 F.2d at 267. The court also construed the statute to resolve any ambiguities in favor of the accused. Id. at 268.

In deference, we find ourselves unpersuaded by the Ninth Circuit's analysis. There is no indication in the 1937 legislative history that three years after the passage of the original statute, Congress' concern was limited to gangster activities. In fact,

---

5. In 1948, the provisions measuring the penalties based upon the value of the amount "stolen or purloined" were raised from $50 to $100. Act of June 25, 1948, ch. 645, 62 Stat. 683, 796. The "reviser's notes" to the 1948 amendment stated:

> The figures "100" were substituted for "50" in view of the fact that the present worth of $100 is less than the value of $50 when that sum was fixed as the dividing line between petit larceny and grand larceny. H.R.Rep.No.304, 80th Cong., 1st Sess. A135 (1947) (Appendix), reprinted in [1948] U.S. Code Cong.Serv. 2434, 2596 (1948 Title 18 pamphlet) (West).

6. In the House, the discussion focused on Representative Wolcott's concern that the original bill "puts simple larceny on the same plane as robbery and breaking and entering in an attempt to commit larceny." He argued that "a distinction should be made between simple larceny within the building and robbery." 81 Cong.Rec. 4656 (1937). As a result, the House amended the bill, as stated above, to make a "distinction ... in the penalty [for stealing or purloining] between felonies and misdemeanors." Id. at 5376 (remarks of Rep. Wolcott).

the Attorney General's letter, quoted above, indicates the contrary. The passage of the burglary provision in almost identical language to that deleted in 1934 suggests that Congress had expanded the scope of its concern with respect to taking property or money from banks. Furthermore, although subsequent legislative history must be used with caution in attempting to derive the intent of an earlier Congress, we believe that the subsequent amendments to § 2113(b) manifest a consistent attempt by Congress to expand rather than restrict the scope of that provision. In 1940, Congress amended the bank robbery act again, creating a new separate substantive offense which made it a federal crime to "receive, possess, conceal, store, barter, sell, or dispose of any property or money or other thing of value knowing the same to have been taken from a bank in violation of [the other provisions of the federal bank robbery act]." Act of June 29, 1940, ch. 455, 54 Stat. 695. This provision is currently codified, in somewhat modified form, as subsection (c) of 18 U.S.C. § 2113. In a series of amendments beginning in 1950, Congress amended § 2113 to expand the scope of the institutions within its provisions. In 1950, Congress amended § 2113 to include federally insured "savings and loan associations" within the coverage of its provisions. Act of August 3, 1950, ch. 516, 64 Stat. 394. In 1952, Congress further expanded the definition of savings and loan associations in § 2113(g) to cover building and loan associations, homestead associations, and state cooperative banks insured by the FSLIC. Act of April 8, 1952, ch. 164, 66 Stat. 46; see S.Rep.No.898, 82d Cong., 1st Sess. 1 (1951). In 1959, the definition of the term "savings and loan association" was again amended to include federal credit unions as defined in the Federal Credit Union Act. Act of September 22, 1959, Pub.L.No.86–354, § 2, 73 Stat. 628, 639. In 1970, § 2113 was again amended to include federally-insured credit unions within its coverage. Act of October 19, 1970, Pub.L.No.91–468, § 8, 84 Stat. 994, 1017.

■ This legislative history demonstrates that Congress' concern had expanded beyond the "gangsterism" referred to in the legislative history of the original 1934 Act and that thereafter Congress' concern was directed at least in part to the federal government's potential obligation as an insurer to reimburse various financial institutions if they were to become victims of offenses covered by § 2113. In view of the absence of any contemporaneously expressed congressional intent when the statute was enacted in 1937, we believe that the conclusion of legislative intent reached by the Ninth Circuit in *LeMasters* is not compelling. On the contrary, it is just as reasonable to conjecture that at that time Congress may have decided that language expressly referring to fraud, artifice and false pretenses in § 2113 might presage a narrow interpretation of other criminal statutes using the words "steal or purloin". *See, e.g.*, 18 U.S.C. § 661, containing similar language construed as not limited to offenses amounting to common law larceny in *United States v. Maloney*, 607 F.2d 222, 231 (9th Cir. 1979), *cert. denied*, 445 U.S. 918, 100 S.Ct. 1280, 63 L.Ed.2d 603 (1980). Since the statute on its face does not limit the words "steal or purloin" as they appear in § 2113(b), we believe they should be given a construction consistent with that given similar statutory language by the Supreme Court in the *Turley* case.

■ We recognize that there may be some concern about broad expansion of federal jurisdiction in criminal law. However, we note that recently the Supreme Court in *McElroy v. United States*, —— U.S. ——, 102 S.Ct. 1332, 71 L.Ed.2d 522 (1982), found that concern unpersuasive in making a broad interpretation of the scope of 18 U.S.C. § 2314. The Court rejected the principle of lenity in the absence of any ambiguity. *Id.* at 1341. It focused on the absence of any limiting language on the face of the statute and on the broad purpose reflected in the congressional history to permit federal prosecutors to come to the aid of the states in combating crime in interstate commerce. *Id.* at 1336–39. Cer-

tainly, when the underlying offense affects federally insured money or property, Congress has a legitimate concern in exercising its jurisdiction to outlaw conduct such as that found to have occurred in this case.

Brown suggests that this court's opinion in *United States v. Pinto*, 646 F.2d 833 (3d Cir.), *cert. denied*, 454 U.S. 816, 102 S.Ct. 94, 71 L.Ed.2d 85 (1981), compels a contrary result. In *Pinto* we held that the language of 18 U.S.C. § 2113(b) "does not include the transfer to the defendant's corporation of bank funds as a result of a unilateral mistake of the bank, or the payment of such funds either to defendant or to creditors of his corporation." *Id.* at 836. In that case, the local bank mistakenly interpreted a foreign telex and credited the defendant's corporation with substantially more funds than authorized by the telex. The defendant withdrew the funds before the bank was aware of the error, and the prosecution for violation of 18 U.S.C. § 2113(b), *inter alia*, was instituted. The difference between the facts in *Pinto* and those presented here, where there was an ongoing and comprehensive scheme to withdraw funds from a series of banks through forged checks, is apparent on its face. Moreover, the holding in *Pinto* was explicitly limited to the facts before the court at that time. As the court stated, "there was no 'taking away' of funds from either bank in a trespassory way." *Id.*

Although there is language in that opinion which might be susceptible of a restrictive construction of the language of 18 U.S.C. § 2113(b), and concern about that restriction was the basis for the position taken by Judge Adams and Judge Garth in voting for rehearing en banc, *United States v. Pinto*, 673 F.2d 74 (3d Cir. 1981) (sur denial of petition for rehearing en banc), we would not be bound by what is at most dictum. The effect on subsequent panels of gratuitous statements is discussed in the dissenting opinion of Judge Aldisert in *Chowdhury v. Reading Hospital and Medical Center*, 677 F.2d 317 at 323–324 (3d Cir.

1982). In any event, the *Pinto* opinion itself carefully distinguishes between the factual situation before it and the fact situation presented here. The court stated that the facts before it were "factually quite different" from those cases where the "bank funds taken and carried away were drawn out of a bank through various fraudulent schemes." 646 F.2d at 837.

For the foregoing reasons, we hold that the words "steal or purloin" in 18 U.S.C. § 2113(b) encompass a scheme, such as this, whereby forged checks were utilized to remove funds from insured banks.

### B.

#### Additional Contentions

■ Brown claims that the trial court erred in refusing to question prospective jurors about their willingness to follow the presumption of innocence. In *Jacobs v. Redman*, 616 F.2d 1251, 1255–56 (3d Cir.), *cert. denied*, 446 U.S. 944, 100 S.Ct. 2170, 64 L.Ed.2d 799 (1980), we held that the trial court did not err in refusing to ask this particular question on voir dire. We are bound by that decision unless the Supreme Court's subsequent opinion in *Carter v. Kentucky*, 450 U.S. 288, 305, 101 S.Ct. 1112, 1121, 67 L.Ed.2d 241 (1981), compels a contrary result. In *Carter v. Kentucky*, the Court held that the trial court must, at the request of the defendant, instruct the jury that a defendant is not compelled to testify and the fact that he or she does not testify cannot be used as an inference of guilt. In the case before us, the defendant does not contend that the trial court failed to give an appropriate jury instruction. Since *Carter v. Kentucky* related only to jury instructions, it does not overrule our holding in *Jacobs v. Redman* that the trial court is not obliged to ask about the presumption of innocence at the voir dire stage of the proceedings.

■ Brown argues that the court erred in permitting testimony by the government

witness Straker regarding acts of check forging by Brown and Straker substantially before the period charged in the indictment. Brown failed to timely object to this testimony at trial, and failed to ask for a limiting instruction. We do not believe that in the circumstances of this case the admission of such evidence can be considered to be plain error. Under Fed.R.Evid. 404(b), evidence of prior crimes or bad acts are admissible " 'if relevant for any purpose other than to show a mere propensity or disposition on the part of the defendant to commit the crime.' " *United States v. Long*, 574 F.2d 761, 765 (3d Cir.), *cert. denied*, 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978). In *Government of the Virgin Islands v. Carino*, 631 F.2d 226, 229 (3d Cir. 1980), we held that "the enumerated purposes [of Rule 404(b)] are not exclusive, as demonstrated by the language of the Rule authorizing use of other crimes evidence 'for other purposes, *such as....*' " (emphasis in original). In this case the testimony of Straker, a co-conspirator and the key prosecution witness, could be considered as relevant to provide necessary background information, to show an ongoing relationship between Straker and Brown, and to help the jury understand Straker's role in the scheme. *See United States v. Dansker*, 537 F.2d 40, 57–58 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

▮ Brown further claims that although the indictment charged a single conspiracy the evidence presented at trial proved three conspiracies. Essentially, defendant is arguing that the evidence at trial failed to sustain the single conspiracy charged in the indictment. However, as this court held in *United States v. Boyd*, 595 F.2d 120, 123 (3d Cir. 1978), the government "may establish the existence of a continuing core conspiracy which attracts different members at different times and which involves different sub-groups committing acts in furtherance of the overall plan." Our review of the evidence convinces us that there was sufficient evidence to prove that

defendants were involved in a single conspiracy, even if each co-conspirator did not know all of the participants in the conspiracy. We also have considered and reject Brown's contentions that the trial court committed error in denying his motions for a severance before and during trial, in refusing to allow him to introduce into evidence the unredacted statement of Elizabeth Baucom, and in permitting the introduction of a tape recording of a telephone conversation between Brown and Straker.

For the foregoing reasons, we will affirm the conviction of Brown.

## IV.

### APPEAL OF MATTIE DOLL SIMMONS

▮ Simmons in her brief adopts the issues submitted on behalf of Brown, and the same disposition with respect to them is appropriate. Simmons stresses in particular the failure of the court to grant her various motions for a severance. Simmons' argument is based on what she claims is the evidence showing her limited involvement in the conspiracy. However, a disparity in the evidence against one of various co-defendants does not in itself entitle that defendant to a severance. *See United States v. Somers*, 496 F.2d 723, 730 (3d Cir.), *cert. denied*, 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974). It is not without significance that Simmons has not challenged the sufficiency of the evidence to support her conviction. In any event, a review of the evidence shows, *inter alia*, that Simmons was connected to the conspiracy at its inception by the statement of Brown to Straker and subsequently by Brown's statement to Stormes; that, as counsel concedes, one of the photographs shown to the jury could have been found by the jury to show Simmons cashing one of the forged checks at the bank; and that there was no evidence that Simmons had withdrawn from the conspiracy. Further, the fact that the jury convicted Simmons on only seven of the remaining twenty-one counts shows that it

was able to distinguish among the defendants in light of the evidence presented as to each. Under these circumstances, we cannot find that the trial court erred in making the discretionary judgment that Simmons had not shown such prejudice by a joint trial as to override the general rule that defendants who are jointly indicted should be jointly tried.

For the above reasons, we will affirm the judgments of conviction of both Maurice Brown and Mattie Doll Simmons.

ADAMS, Circuit Judge, concurring.

I agree with the majority that this case is factually distinguishable from *United States v. Pinto*, 646 F.2d 833 (3d Cir.), *cert. denied*, 454 U.S. 816, 102 S.Ct. 94, 71 L.Ed.2d 85 (1981), and hence that the conduct at issue here falls within the ambit of 18 U.S.C. § 2113(b). I therefore join in Judge Sloviter's opinion, but write separately simply to reiterate my belief that the *Pinto* decision posited a "crabbed and unrealistic interpretation" of section 2113(b) that will lead, as it has here, to minute—and ultimately unsatisfying—distinctions between cases. *See United States v. Pinto*, 673 F.2d 74 (3d Cir. 1981) (sur denial of petition for rehearing en banc). When strained interpretations of the criminal law produce results understandable neither by the public, nor, indeed, by judges themselves, they subvert rather than enhance respect for the justice system. Accordingly, I continue to believe *Pinto* should be overruled at the first opportunity.