**UNITED STATES of America,**

v.

**PINTO, Biagio a/k/a Bob Pinto, Appellant.**

**No. 80–2420.**

United States Court of Appeals, Third Circuit.

Argued Jan. 23, 1981.

Decided April 16, 1981.

Rehearing and Rehearing En Banc Denied May 8, 1981.

Rehearing and Rehearing In Banc Denied June 10, 1981.

---

**834**

Jacob Kossman (argued), Philadelphia, Pa., for appellant.

Peter F. Vaira, U. S. Atty., Walter S. Batty, Jr., Asst. U. S. Atty., Chief, Appellate Section, Stanley Weinberg, Asst. U. S. Atty. (argued), Philadelphia, Pa., for appellee.

Before GIBBONS and VAN DUSEN, Circuit Judges, and ACKERMAN,* District Judge.

## OPINION OF THE COURT

VAN DUSEN, Senior Circuit Judge.

Defendant, Biagio Pinto, was charged in a three-count indictment with violating 18 U.S.C. § 2113(b), 18 U.S.C. § 1014, and 18 U.S.C. § 1343, respectively. The district court jury returned a verdict of guilty on Counts 1 and 2 and not guilty on Count 3.[1] Defendant was sentenced to five years' imprisonment on Count 1 and five years' probation on Count 2. We reverse defendant's conviction and sentence under Count 1 because his conduct lies outside the scope of activity proscribed by 18 U.S.C. § 2113(b). We affirm his conviction on Count 2 and remand with respect to the sentence on that count as indicated in part III below.

## I. FACTS

Defendant Pinto was the president of Pinto Trucking Service, Inc. ("PTS"). On June 5, 1974, Nissin Unyu Soko ("Nissin"), a Japanese customer of PTS, instructed its bank in Japan, the Sanwa Bank Limited ("Sanwa Bank"), to remit $193.51 to PTS to satisfy a business debt.[2] Sanwa Bank did

---

* Honorable Harold A. Ackerman, United States District Judge for the District of New Jersey, sitting by designation.

1. There were actually two jury trials in this case. In the first, a jury found defendant guilty on all three counts charged. The trial judge,

however, set aside that verdict and granted a new trial because the jury had considered extraneous material.

2. This debt arose in connection with a single contractual agreement between Nissin and

so by sending a telex communication to its correspondent bank in the area, Philadelphia National Bank ("PNB").

On June 6, 1974, PNB received the telex from the Sanwa Bank. In processing it, however, PNB mistakenly interpreted the telex to be a transmission of $193,511. Unaware of its mistake, PNB notified PTS and asked that firm how it wished to have the $193,511. handled. PTS, through its comptroller, requested that PNB deposit the funds in the PTS account at First Pennsylvania Banking and Trust Company ("First Pennsylvania"). PNB did so.

Subsequently, Pinto,[3] as president of PTS, drew checks on the corporation's account to pay its creditors. By the end of July 1974, the account, including the $193,-511. deposit, was completely exhausted.

Meanwhile, PNB had not yet discovered its error. On July 31, 1974, PNB received a form letter from the Sanwa Bank stating that Sanwa did not recognize the $193,511. charge. PNB responded routinely and provided the Sanwa Bank with the data necessary to trace the transaction.

On September 23, 1974, PNB received an "urgent" letter from the Sanwa Bank stating that the June 6, 1974, transmittal for the PTS account was $193.51, not $193,511. PNB reviewed the cable, finally realized its mistake, immediately called PTS to inform it of the error, and demanded repayment of the difference. The comptroller at PTS responded that he would investigate the matter and report back as soon as possible.

On September 27, 1974, an independent auditor at PTS called PNB. He reported that defendant Pinto had assured him PTS had invoices for the $193,511. and that PTS was entitled to the money. PNB again verified the telex mistake with the Sanwa Bank, sent copies of the verification to the attorney for PTS, and demanded repayment. On October 2, 1974, the PTS attorney responded, stating that PTS still believed it was entitled to the money.

By mid-October 1974, PTS acknowledged that the remittance was a mistake and commenced negotiations with PNB to repay the money. The negotiations proved fruitful and PTS reimbursed the bank for the overpayment by the end of 1978.

## II. DISCUSSION

### A. *Count 1*

Count 1 charges that:

(A) in accordance with instructions of Nissin, Sanwa Bank transmitted, by wire and radio communication, on or about June 6, 1974, to PNB $193.51 for ultimate payment to PTS, but an employee of PNB misinterpreted the communication and caused $193,511. to be transferred from the Sanwa Bank's account at PNB to the First Pennsylvania account of PTS;

(B) defendant knew of this transfer to the PTS account on or about June 6, 1974, and that none of the books and records of PTS showed that $193,511., as opposed to $193.51, was owed to PTS from Nissin; and

(C) in or about June and July 1974, defendant caused approximately $193,511. to be withdrawn from the PTS account at First Pennsylvania with intent to steal and purloin money of value exceeding $100. belonging to PNB, the deposits of which were insured by the Federal Deposit Insurance Corporation ("FDIC"), the money being in the care, custody, and control of First Pennsylvania, the deposits of which were insured by the FDIC.

As noted above, the prosecution submitted evidence from which the jury was justified in finding that the language of the above charges had been proved beyond a

PTS, effective from 1971 through 1974. This agreement resulted in approximately $15,000. of business and was the only contract between the two corporations.

**3.** It was undisputed that defendant had full control of the day-to-day operations of PTS and made all of the major decisions for the corporation. Thus, the propriety of holding him responsible for drawing checks on the $193,511. and for representing to PNB that PTS had invoices entitling it to the money (see below) was never questioned.

reasonable doubt. After careful consideration, we have concluded that this proof and these charges in Count 1 do not constitute a violation of 18 U.S.C. § 2113(b), which provides that

"Whoever takes and carries away, with intent to steal or purloin, any property or money or any other thing of value exceeding $100 belonging to, or in the care, custody, control, management, or possession of any bank ... shall be fined not more than $5,000 or imprisoned not more than ten years, or both ...."

■ The words of 18 U.S.C. § 2113(b) quoted above, the title of the Act which inserted this language in the Bank Robbery Statute in 1937,[4] and the legislative history of the 1937 amending act[5] support a construction of this statute that does not include the transfer to the defendant's corporation of bank funds as a result of a unilateral mistake of the bank, or the payment of such funds either to defendant or to creditors of his corporation. The actions of defendant were fraud-type offenses not contemplated by the above quoted language. *See United States v. Rogers*, 289 F.2d 433, 437–38 (4th Cir. 1961). In this case, there was no "taking away" of funds from either bank in a trespassory way. *See also LeMasters v. United States*, 378 F.2d 262, 264 (9th Cir. 1967).

The Supreme Court has stated, in discussing other language of 18 U.S.C. § 2113, that, since the double jeopardy provision of the Fifth Amendment does not bar federal prosecution under this criminal statute "though a state conviction based on the

same acts has already been obtained...., additional weight [is given] to the view that where Congress is creating offenses which duplicate or build upon state law, courts should be reluctant to expand the defined offenses beyond the clear requirements of the terms of the statute." *Jerome v. United States*, 318 U.S. 101, 105, 63 S.Ct. 483, 486, 87 L.Ed. 640 (1943).

Also, it is noted that 18 U.S.C. § 2113 has been included by Congress in Chapter 103, entitled ROBBERY AND BURGLARY, of Part I of Title 18 covering crimes, whereas 18 U.S.C. § 1014, the basis for Count 2 of the indictment, is included in Chapter 47 of such Part I, entitled FRAUD AND FALSE STATEMENTS, which title most aptly describes the gravamen of the offense with which the defendant is charged.[6]

The Supreme Court has consistently resolved any ambiguity in 18 U.S.C. § 2113 "in favor of lenity when required to determine the intent of Congress in punishing multiple aspects of the same criminal act." *Heflin v. United States*, 358 U.S. 415, 419, 79 S.Ct. 451, 453, 3 L.Ed.2d 407 (1959), citing *Prince v. United States*, 352 U.S. 322, 77 S.Ct. 403, 1 L.Ed.2d 370 (1957).[7]

We do not believe that the decision in *United States v. Patton*, 120 F.2d 73 (3d Cir. 1941), relied on by the prosecutor, is controlling on the facts now before the court. The issue there involved the language now in 18 U.S.C. § 2113(a), as opposed to the wording now in 18 U.S.C. § 2113(b) under which Count 1 of the indictment now before this court was filed.[8] Similarly, *United States*

---

**4.** "To amend the bank-robbery statute to include burglary and larceny," 50 Stat. 749.

**5.** *See* House Report No. 732, 75th Cong. 1st Sess., and Senate Report No. 1259, 75th Cong. 1st Sess. *See also* 81 Cong.Rec. 4656 and 5376.

**6.** In this connection, we note that the National Motor Vehicle Theft Act, 18 U.S.C. § 2312, is not included in Chapter 103 but is included in Chapter 113 of Part I of Title 18, which Chapter is entitled STOLEN PROPERTY. *Cf. United States v. Turley*, 352 U.S. 407, 177 S.Ct. 397, 1 L.Ed.2d 430 (1957).

**7.** In *Prince, supra* 352 U.S. at page 329, 77 S.Ct. at page 407, the Court used this language in

commenting on permissible sentences under 18 U.S.C. § 2113:

"While reasonable minds might differ on this conclusion, we think it is consistent with our policy of not attributing to Congress, in the enactment of criminal statutes, an intention to punish more severely than the language of its laws clearly imports in the light of pertinent legislative history."

**8.** In *Patton*, the court used this language at page 74–75 of 120 F.2d:

"The government states that the question involved on this appeal is whether under the facts above stated the defendant was guilty of entering a national bank with intent to

*v. Bryan*, 483 F.2d 88 (3d Cir. 1973), involved a different section of the criminal code (18 U.S.C. § 659), and we do not believe the wording in footnote 1 of that opinion (483 F.2d at 91), relied on by defendant, is binding on this court in this case.[9]

We note that the decisions of courts of appeals for other circuits relied on by the prosecution are factually quite different in that the bank funds taken and carried away were drawn out of a bank through various fraudulent schemes, such as (1) the use of stolen checks deposited in bank accounts of the thief's wife and under an assumed name used by the thief (*United States v. Giuffre*, 576 F.2d 126 (7th Cir.), *cert. denied*, 439 U.S. 833, 99 S.Ct. 113, 58 L.Ed.2d 128 (1978)), (2) the sale of bearer bonds, stolen from a bank vault, at discount prices to investigators working for that bank (*United States v. Fistel*, 460 F.2d 157 (2d Cir. 1972)), and (3) drawing money in cash from the thief's bank account when he knew the bank had mistakenly inflated the amount in that account (*Thaggard v. United States*, 354 F.2d 735 (5th Cir. 1965), *cert. denied*, 383 U.S. 958, 86 S.Ct. 1222, 16 L.Ed.2d 301 (1966)). In none of these cases was a credit (a) made to an established account due to the unilateral mistake of another bank, and (b) utilized fraudulently by the defendant through drawing on such account to both the account owner's creditors and the defendant.

For the above reasons, we decide that defendant's dissipation of funds credited to his bank account wholly because of another bank's unilateral error is not conduct punishable under 18 U.S.C. § 2113(b) under the circumstances presented by this record. Defendant's conviction on Count 1, therefore, will be reversed.[10]

### B. *Count 2*

Count 2 charges, *inter alia* :

"2. . . . Bob Pinto, did knowingly make and cause to be made, materially false statements for the purpose of influencing the actions of PNB upon the advance of the $193,511 to the Pinto account at First Pennsylvania by deferment of action and otherwise.

"3. The materially false statements referred to in paragraph 2 of this Count of the Indictment are more fully described as follows:

"a. BIAGIO PINTO, a/k/a Bob Pinto, did cause PNB to be informed that Nissin did owe $193,511 to PTS when in truth and in fact as he then well knew, Nissin did not owe PTS $193,511; and

"b. BIAGIO PINTO, a/k/a Bob Pinto, did cause representations to be made to PNB that there were genuine documents, records, and invoices showing that Nissin did owe $193,511 to PTS when in truth and in fact as he then well knew there were no genuine documents, records, and invoices showing that Nissin did owe $193,511 to PTS.

\*   \*   \*   \*   \*   \*

commit larceny therein. It seems to be conceded that to take and carry away from a bank property belonging to it with intent to steal and purloin the same, as charged in the third count, is the equivalent of committing larceny in the bank. We shall accordingly limit our consideration to the question stated by the government. . . .

" 'Larceny, at common law, is the taking and removing, by trespass, of personal property which the trespasser knows to belong either generally or specially to another, with the felonious intent to deprive him of his ownership therein.' Clark's Cr.Law (3rd Ed.) 305. One of the essential elements of the crime is that the taking is by trespass, that is, without the consent of the owner. . . .

"That the defendant in the present case did not take the money from the bank teller against his will is undisputed."

**9.** The language describing 18 U.S.C. § 2113(b) was not decisive in the *Bryan* case but was merely used as a basis for comparison with 18 U.S.C. § 659.

**10.** Because we reverse defendant's conviction under Count 1, we need not address two of his remaining arguments: that the district court erroneously excluded certain evidence and that it improperly instructed the jury on the law applicable to Count 1.

"In violation of Title 18, United States Code, Section 1014 and Section 2(b)." [11]

The pertinent language of 18 U.S.C. § 1014 provides:

"Whoever knowingly makes any false statement ... for the purpose of influencing in any way the action of ... any bank the deposits of which are insured by the Federal Deposit Insurance Corporation ... upon any ... advance ..., by ... deferment of action or otherwise, ... shall be fined not more than $5,000 or imprisoned not more than two years, or both."

PNB is a bank insured by the FDIC.

■ Defendant does not dispute that he made "false statements" to PNB when he, through his attorney, stated that PTS was entitled to the $193,511. [12] Rather, defendant argues the $193,511. does not constitute an "advance" within the meaning of 18 U.S.C. § 1014. We disagree.

The term "advance" has not been specifically defined in any case law cited to this court. [13] Defendant contends that "advance" should be construed as referring only to funds extended as a loan in a credit transaction. Cases involving false representations made on loan applications constitute the bulk of convictions under 18 U.S.C. § 1014. See United States v. Scalzitti, 578 F.2d 507 (3d Cir. 1978).

■ "Advance," as used in 18 U.S.C. § 1014, should not be so narrowly construed as to apply solely to funds extended in a loan situation. The statute refers to both "advance" and "loan." If "advance" was only to refer to a loan, the term "advance" would be rendered meaningless.

Furthermore, the statute was intended to maintain the vitality of the FDIC insurance program, United States v. Bush, 599 F.2d 72, 75 (5th Cir. 1979), and "to cover all undertakings which might subject the FDIC insured bank to risk of loss." United States v. Stoddart, 574 F.2d 1050, 1053 (10th Cir. 1978). In United States v. Payne, 602 F.2d 1215 (5th Cir. 1979), the Fifth Circuit Court of Appeals interpreted 18 U.S.C. § 1014 as prohibiting "check kiting," a practice not specifically proscribed in the statute and, as in the present case, not involving a credit transaction. [14]

We hold that defendant's conduct violated 18 U.S.C. § 1014. Substantial evidence supports the jury's determination that defendant made false representations with the intent to influence PNB, a federally insured bank, in its action on the $193,511. deposit. The mistaken deposit into defendant's account constitutes an "advance" under the terms of 18 U.S.C. § 1014. Defendant's conviction on Count 2 will be affirmed.

### III. CONCLUSION

Defendant's conviction and sentence on Count 1 will be reversed. His conviction on Count 2 will be affirmed and the case will be remanded as to the sentence on Count 2 so that the prosecution may apply to the district court for resentencing on that count, in light of the reversal of the conviction and sentence on Count 1. See United States v. Busic, 639 F.2d 940 (3d Cir. 1981).

Adams, J. and Garth, J., dissenting.

---

11. Appellant's Appendix 13A–14A.

12. The jury was entitled to find that Pinto's purpose in providing such false information was to persuade PNB to defer taking action to recover the money which PNB had advanced to the PTS account at First Pennsylvania.

13. Black's Law Dictionary 48 (5th ed. 1979) includes in the many common meanings given to "advance": "furnishing money or goods for others in expectation of reimbursement." Other courts have affirmed convictions based on oral statements and rejected defendant's suggestion that only written applications for loans or other writings can violate § 1014. United States v. Sackett, 598 F.2d 739 (2d Cir. 1979); United States v. Stoddart, 574 F.2d 1050 (10th Cir. 1978).

14. Two district courts in the Third Circuit have determined that "check kiting" is not punishable under 18 U.S.C. § 1014. United States v. Sher, 505 F.Supp. 858, 861–62 (W.D.Pa.1981), appeal docketed, No. 81–1317 (3d Cir. Feb. 27, 1981); United States v. Edwards, 455 F.Supp. 1354 (M.D.Pa.1978). We specifically do not address that issue here.