

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-25-2001

# United States v. Howerter

Precedential or Non-Precedential:

Docket 00-3188

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"United States v. Howerter" (2001). *2001 Decisions.* Paper 89.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/89

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 25, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 00-3188

UNITED STATES OF AMERICA

v.

THOMAS HOWERTER,
        Appellant

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Criminal No. 99-cr-00034-1)
District Judge: Honorable Donetta W. Ambr ose

Argued September 12, 2000

Before: McKEE, RENDELL, and STAPLETON,
Circuit Judges

(Filed: April 25, 2001)

        Michael J. Novara, Esq. [ARGUED]
        Office of Federal Public Defender
        960 Penn Avenue
        415 Convention Tower
        Pittsburgh, PA 15222
        Counsel for Appellant

        Bonnie R. Schlueter, Esq. [ARGUED]
        Office of United States Attorney
        633 United States Post Office &
         Courthouse
        Pittsburgh, PA 15219
        Counsel for Appellee

OPINION OF THE COURT

RENDELL, Circuit Judge.

Thomas Howerter appeals his conviction for bank lar ceny
under 18 U.S.C. S 2113(b). The District Court determined
that the elements required by the statute had been
satisfied. On appeal, Howerter contends that his conduct is
not proscribed by the federal bank larceny statute. We
agree, and we will REVERSE.1

I. Facts and Procedural History

From 1994 to 1997, while living in Germany, Howerter
was the treasurer of the Wuerzbur g American High School
Parent Teacher Student Association ("PTSA"), a private
organization located in West Ger many that collected private
donations and issued scholarship checks to the children of
Army employees to help defray the cost of college tuition.
As treasurer, Howerter was r sponsible for collecting
donations, depositing them in a bank account, and writing
checks to the colleges and universities in the name of the
student recipients, all on behalf of PTSA.

On September 22, 1994, PTSA opened a bank account at
Community Bank, a division of Nations Bank, which is
insured by the Federal Deposit Insurance Corporation
("FDIC"). Howerter signed the signatur e card as custodian,
which authorized the bank to honor his signatur e for the
payment of funds and the transaction of business on the
account. In 1996 and 1997, Howerter betrayed the trust
placed in him, withdrawing $18,000 from the account by
writing checks on the account payable to himself, signing
the checks as drawer, endorsing them, and then keeping
the money for himself, instead of using it for PTSA's
purposes. On January 20, 1996, Howerter also withdr ew
$525 in cash from the account by the use of a withdrawal

_____

1. Howerter also urged that the statute was unconstitutional as applied
to him; the District Court rejected this ar gument. We do not reach this
issue because we reverse based on the scope of the statute itself.

slip. He cashed fifteen of the seventeen checks at the same branch of Nations Bank in Kitzingen, Germany, and the same teller handled all of these transactions. Some of the checks bore memo notations, such as "senior class party," and "scholarship." Although Nations Bank suf fered no loss as a result of Howerter's conduct, PTSA clearly did.

In March 1999, a grand jury in the Western District of Pennsylvania returned a one count indictment charging Howerter with bank larceny under 18 U.S.C.S 2113(b). Specifically, the indictment charged that fr om June 1, 1996, to July 31, 1997, Howerter stole $19,025 fr om an account in the custody of Nations Bank, an FDIC-insured bank. After a non-jury trial, he was convicted, and has appealed from the Court's final judgment entered on November 5, 1999.

We exercise plenary review over the issue that is the basis for our reversal of Howerter's conviction: whether 18 U.S.C. S 2113(b) was properly applied in the instant case. See Kapral v. United States, 166 F.3d 565 (3d Cir. 1999) (holding that issues of statutory interpretation are subject to plenary review).

II. Discussion

On appeal, Howerter challenges his conviction and the District Court's denial of his motion for acquittal, urging that S 2113(b) has been improperly applied to him because his conduct does not fit within the statutory purview.

The bank larceny statute at issue, 18 U.S.C.S 2113(b), provides in relevant part:

> Whoever takes and carries away, with intent to steal or purloin, any property or money or any other thing of value exceeding $100 belonging to, or in the car e, custody, control, management, or possession of any bank, credit union, or any savings and loan association, shall be fined not more than $5,000 or imprisoned not more than ten years, or both. 2

_____

2. The jurisdictional element is found in 18 U.S.C. S 2113(f):

3

Howerter frames his argument as follows:

> The scope of the federal bank larceny statute has evolved over many years so as to include lar ceny by false pretenses. However, in every case of larceny by false pretenses, the bank itself was the victim of some fraudulent conduct by the defendant.
>
> In the present case, Mr. Howerter was authorized to sign checks drawn on the fund's account, and the bank was authorized to cash those checks. As far as the bank was concerned, Mr. Howerter lawfully withdrew the funds pursuant to the terms of the account. No material misrepresentations were made to the bank by Mr. Howerter to induce the r elease of the monies.
>
> Although Mr. Howerter ultimately kept the money for himself, this is a matter between Mr. Howerter and the scholarship fund, not between Mr. Howerter and the bank. Accordingly, Mr. Howerter did not commit bank larceny within the meaning of the federal bank larceny statute.

App. Br. at 7-8. In response, the gover nment argues that withdrawal of money under false pretenses satisfies the "taking" element, that the money was clearly in the custody and control of the bank, and that "[t]he stipulated facts establish that Howerter misrepresented that he was acting within his authority by cashing checks when he intended to keep, and did keep, the money himself." Appellee Br. at 10-11.

The District Court held that the elements of the crime of bank larceny had been established beyond a r easonable

_____

> As used in this section the term "bank" means any member bank of the Federal Reserve System, and any bank, banking association, trust company, savings bank, or other banking institution organized or operating under the laws of the United States, including a branch
> of agency of a foreign bank (as such ter ms are defined in paragraphs (1) and (3) of section 1(b) of the Inter national Banking
> Act of 1978), and any institution the deposits of which are insured by the Federal Deposit Insurance Corporation.

4

doubt by the parties' stipulations, and recounted these elements as follows: (1) Defendant took or carried away more than $100.00 of money in the custody of a bank; (2) Defendant did so intentionally, knowing that he was not entitled to it; and (3) the bank's deposits wer e insured by the FDIC. Dist. Ct. Op. at 2.

As should be readily apparent from the foregoing recitation of Howerter's argument, the statutory language, and the government's position, the statute could be read to cover this situation. But we are not certain that it should be. We have not been able to locate a similar , or even comparable, fact pattern, and the gover nment concedes that the dearth of law on point is due to the fact that Mr. Howerter's conduct was subjected to federal pr osecution because of the lack of any other prosecutorial agency with jurisdiction over him.

We will begin the process of deter mining whether Howerter's conviction for bank larceny should stand by examining the origins of the statute and the r elevant precedent construing it. In 1934, Congr ess first considered a bill designed "to provide punishment for certain offenses against banks, organized or operating under laws of the United States, or any member of the Federal Reserve System." S. 2841, 73d Cong. (1934). It made bank robbery a federal crime by punishing anyone who "by for ce and violence, or by putting in fear, feloniously takes, or . . . attempts to take . . . any property or money" from a bank, id., and was one of several bills intr oduced by the Attorney General, who enclosed a letter expressing concern that legislation was needed to curb "organized groups of gangsters who . . . move rapidly from the scene of one crime of violence to another across State lines," S. Rep. No. 73–537, at 1 (1934); H.R. Rep. 73–1461, at 2 (1934). This bill passed both the House of Representatives and the Senate and became law. 78 Cong. Rec. 8768, 8776 (1934).

The law was amended in 1937, when a bill was introduced that was "designed to enlar ge the scope of the bank robbery statute, enacted in 1934, . . . to include larceny and burglary of the banks pr otected by this statute." H.R. Rep. No. 75–732, at 1 (1937). Once passed, it became a crime for anyone to "take and carry away, with

5

intent to steal or purloin, any property or money or any other thing of value . . . belonging to . . . any bank." 78 Cong. Rec. 8776 (1937). There is very little legislative history regarding the 1934 bill or its amendment in 1937.

We had occasion to examine the federal bank larceny statute in United States v. Pinto, 646 F .2d 833 (3d Cir. 1981), and a year later in United States v. Simmons, 679 F.2d 1042 (3d Cir. 1982). In Pinto , a foreign bank of one of the defendant's customers remitted $193,511 to the defendant, instead of the $193.51 instructed by the customer. 646 F.2d at 834. The defendant at first insisted he had invoices for the amount received but later acknowledged that the amount transmitted had been a mistake, and was prosecuted for bank lar ceny. Id. We reversed the conviction, holding that one who makes use of funds deposited into his account as a result of a unilateral mistake of the bank has not engaged in taking funds away from the bank in a trespassory way, and, thus, is not guilty of bank larceny under 18 U.S.C. S 2113(b).3 Id. at 837.

In Simmons, the defendant was a co-conspirator in an elaborate scheme involving the cashing of for ged checks. We characterized the issue before us as being "whether evidence of a comprehensive scheme to negotiate checks bearing forged signatures is encompassed within statutory language proscribing `taking and carrying away, with intent to steal or purloin property or money belonging to a federally insured bank.' " 679 F.2d at 1043 (quoting 18 U.S.C. S 2113(b)).

_____

3. Pinto's exact holding has been subjectto different interpretations. We understand the opinion to distinguish Pinto's conduct from common law larceny due to the lack of a trespassory taking, and also to differentiate it from the conduct in other cases wher e the defendant engaged in a fraudulent scheme. With respect to the latter distinction, Pinto appears to distinguish between a scheme hatched contemporaneously with the bank's receipt of funds and before an actual taking, as was the case in Thaggard v. United States, 354 F.2d 735, 736-38 (5th Cir. 1965) (stating that bank larceny statute can be construed to cover defendant's drawing money in cash from his bank account knowing that bank had mistakenly inflated amount in account), and one that was conceived later, as or after funds were actually withdrawn from the account. We do not rely on Pinto, and thus need not assess whether, in light of Bell, the reasoning in Pinto would continue to excuse Pinto's conduct today.

6

Defendants urged that their embezzlement or obtaining by false pretenses was not encompassed within the term "steal or purloin" in the statute. Noting that three other circuits had rejected this narrow interpretation, we reviewed the legislative process that led to passage of the law. Id. at 1046-47. We concluded that the law "was directed at least in part to the federal gover nment's potential obligation as an insurer to r eimburse various financial institutions if they were to become victims of offenses covered by S 2113." Id. at 1048. We concluded that by using the term "steal or purloin," Congress meant to reach conduct beyond the trespassory4 taking of common law larceny, and that we should not construe the word "steal" as nothing more than larceny, as may have been the case at common law. Instead, we adopted the meaning of "steal" as interpreted by the Supr eme Court in United States v. Turley, 352 U.S. 407, 412 (1957), namely, as defined in Black's Law Dictionary, to denote "the criminal taking of personal property either by lar ceny, embezzlement, or false pretenses." Simmons, 679 F.2d at 1045. We concluded that the words "steal or purloin" encompassed a "scheme whereby forged checks were utilized to remove funds from insur ed banks." Id. at 1049.

In Simmons, we downplayed the concer n about the expansion of federal jurisdiction in the area of criminal law, noting that the Supreme Court in McElr oy v. United States, 455 U.S. 643 (1982), in interpreting 18 U.S.C.S 2314, had found this concern unpersuasive in light of the greater concern expressed in the statutory language and the congressional purpose regarding the need for the federal government to aid states in combating crime in interstate commerce. 679 F.2d at 1048. We also remarked: "Certainly, when the underlying offense affects federally insured money

_____

4. The term "trespassory" means without the owner's consent. See Pinto, 646 F.2d at 836 n.8 ("[O]ne of the essential elements of "common law larceny" is that the taking is by tr espass, that is, without the consent of
the owner."); United States v. Johnson , 575 F.2d 678, 679 (8th Cir. 1978) ("Common law larceny requires a tr espass in the taking."); Bennett v. United States, 399 F.2d 740, 743 (9th Cir . 1968) ("To consummate the offense of larceny there must occur a taking of property which is trespassory in nature, `without the consent of the owner.' ").

7

or property, Congress has a legitimate concern in exercising its jurisdiction to outlaw conduct such as that found to have occurred in this case." Id. at 1049.

We also took pains to distinguish our ruling in Simmons from our previous decision in Pinto , where we had found no bank larceny:

> The difference between the facts in Pinto and those presented here, where there was an ongoing and comprehensive scheme to withdraw funds fr om a series of banks through forged checks, is appar ent on its face. Moreover, the holding in Pinto was explicitly limited to the facts before the court at that time. As the court stated, "there was no `taking away of funds from either bank in a trespassory way.' " The court stated that the facts before it were "factually quite different" from those cases where the "bank funds taken and carried away were drawn out of a bank thr ough various fraudulent schemes."

Id. at 837.

In many ways, Simmons presaged the Supr eme Court's ruling on this issue the very next year in Bell v. United States, 462 U.S. 356 (1983). In Bell, the Supreme Court held that the federal crime of bank larceny was not limited to common law larceny, and that the statutory language was broad enough to include conduct encompassed in the crime of taking under false pretenses. Id. at 361. Bell had deposited a stolen check for $10,000 into a newly-opened account using his own name but otherwise false information. Id. at 357. He had alter ed the endorsement to reflect his own new deposit account number . Id. After waiting several days, he closed the account and took the funds. Id. The Supreme Court had little difficulty determining that, while what Bell had done would also be chargeable as taking under false pretenses, it nonetheless fit within the statutory language for the federal crime of bank larceny: "The evidence is clear that he`took and carried away, with intent to steal or purloin, [over $10,000 that was] in the care, custody, contr ol, management or possession of ' Dade Federal Savings and Loan." Id. at 361 (quoting 18 U.S.C. S 2113(b)). The Court r easoned that a

8

reading of the statute so as to limit it to common law larceny was not appropriate because, while the concept of "takes and carries away" is an element of lar ceny at common law, the element "with intent to steal or purloin" evidences Congress' intent to go beyond common law larceny because this phrase had no established meaning at common law.5 Id. at 360.

The courts in both Simmons and Bell focused on, and essentially based their interpretation of the statutes on, the view that the purpose to be served by a federal statute such as this is "to protect banks from those who wished to steal banks' assets -- even if they used no force in doing so." Id. at 362. The fact that the conduct might fall outside common law larceny was of no moment. The Supr eme Court in Bell concluded:

> The congressional goal of protecting bank assets is entirely independent of the traditional distinction on which Bell relies. To the extent that a bank needs protection against larceny by trick, it also needs protection from false pretenses. W e cannot believe that Congress wished to limit the scope of the amended Act's coverage, and thus limit its remedial purpose, on the basis of an arcane and artificial distinction more suited to the social conditions of 18th century England than the needs of 20th century America. Such an interpretation would signal a retur n to the "incongruous results" that the 1937 amendment was designed to eliminate.

Id.

We had occasion to construe the statute again, but in a different factual setting, in United States v. Goldblatt, 813 F.2d 619 (3d Cir. 1987), again addr essing the reach of 18 U.S.C. S 2113(b). Goldblatt's son made A TM withdrawals

_____

5. The Supreme Court did not refer ence the rule of lenity, but relied on its view of the legislative history as dictating that the statute was not intended to proscribe only common law lar ceny. Bell, 462 U.S. at 361–62. In his dissent, Justice Stevens argued that a narrower reading was consistent with a limited purview of federal criminal legislation where the intended coverage is not clear. Id. at 363.

9

from his father's bank account while Goldblatt was incarcerated. 813 F.2d at 621. When Goldblatt was released from jail, he reported to the bank that his ATM card had been stolen, and claimed the right to the withdrawn funds. Id. His requests were at first denied, but after he swore in an affidavit that he could not identify the person depicted in the six ATM photographs, the bank reimbursed his account for the withdrawn funds. Id. Goldblatt then withdrew these funds. Id. Subsequently, the bank learned that the man in the photographs was Goldblatt's son, and charged Goldblatt with bank larceny. Id. He argued that because the bank had authorized him to withdraw the funds, he could not be guilty of bank larceny. Id. at 624.

However, the crucial fact in Goldblatt was that the authorization was obtained by way of false pr etenses, that is, by Goldblatt misrepresenting to the bank that he did not recognize his son in the ATM photographs. Id. at 622. We therefore held that because S 2113(b) prohibits a broader range of conduct than common law larceny, as we had held in Simmons, the "taking and carrying away" element could be satisfied by Goldblatt's conduct -- withdrawing funds pursuant to a scheme to defraud in order to deprive the bank of funds. Id. at 625.

We are called upon in the case befor e us to answer the question addressed so many times before: When does the withdrawal or "taking" of funds from a federal bank constitute federal bank larceny? Or, mor e specifically, does the defendant's conduct under the facts of this casefit within the activity proscribed by the federal bank larceny statute? As we have noted, when faced with this question in Simmons and Goldblatt, we answer ed in the affirmative. Here, we must draw the line once again, this time examining Howerter's conduct in light of the facts of the case. Was what Howerter did "taking and carrying away with intent to steal or purloin?" We conclude that it was not. We find two basic distinguishing facts present here: first, the unchallenged fact of Howerter's authority to do precisely what he did vis-a-vis the bank -- namely, withdraw PTSA's funds; and second, the absence of any fraudulent conduct directed at the bank, by way of a scheme to deprive it of funds or otherwise. In the cases we

10

discuss above, we found the statute to apply because the defendant had obtained money by false pretenses through a fraudulent scheme directed at the bank. In each case, we found that the defendant's conduct constituted "taking and carrying away with intent to steal or purloin," even though the traditional attribute of bank larceny, namely a "trespassory taking," was not present. See e.g., United States v. Martin, 215 F.3d 470 (4th Cir . 2000) (affirming bank larceny conviction based on robbery of an armored truck); United States v. Sacasas, 381 F .2d 451 (2d Cir. 1967) (upholding multiple count conviction including bank larceny where defendants participated in a bank holdup).

Here, there is no evidence of either tr espassory conduct constituting common law larceny, which is clearly covered by the statute, or of a fraudulent scheme that would make Howerter guilty of obtaining money by false pr etenses, as in Bell, Simmons, and Goldblatt. To the contrary, there is no allegation of a lack of consent by the bank, and therefore, there was no trespassory conduct. And because there was no falsity or false pretenses directed at the bank in obtaining this consent, Howerter's conduct was not fraudulent vis-a-vis the bank. Hence, Howerter's conduct neither falls within the traditional purview of this statute, that is, common law larceny by way of a tr espassory taking, nor within the expanded concept of bank larceny after Bell and Simmons, which includes a non-tr espassory taking accomplished by way of a fraudulent scheme dir ected at the bank.

We, therefore, conclude that Howerter's conduct does not fit within the parameters of the statute.6 We note, also, that we need not decide the precise contours of the statutory provision regarding "taking," but only hold that lacking any evidence of trespassory or fraudulent conduct directed at

_____

6. We also note that this case differs from Simmons and Bell not only because of the lack of fraudulent conduct dir ected at the bank, but, also, due to the fact that there was no loss or potential loss to the bank here. As we reference in our discussion above, the case law routinely relies on congressional policy to protect banks and their assets as the underpinning of this statute. We submit that this bolsters our view that the legislature was not trying to combat conduct like Howerter's.

11

the bank, there was no taking from the bank's custody as contemplated by the statute.

The District Court may have been misguided by its own recitation of the "elements" of the crime of bank larceny.7 It never really focused on the phrase that has been interpreted repeatedly, as we have noted,"takes and carries away, with intent to steal or purloin." It is this phrase, and its elucidation in the case law, that leads us to conclude that Howerter's conduct does not fall within the confines of the criminal conduct that the statute proscribes.

In so holding, we reject the government's argument that when Howerter withdrew the funds for his own purposes, allegedly knowing he would steal those funds fr om the organization, he used false pretenses to obtain the funds from the bank. Tempting as it may be to punish private embezzlement in this way, were we to include this conduct as falling within the concept of obtaining bank funds by false pretenses, every misused but otherwise consented to withdrawal would be subject to federal prosecution. We cannot help but view the language from the case law that we have referenced above regar ding congressional policy to protect banks to mean that the falsity, embezzlement, or fraudulent scheme must have been directed at, or implicated, the bank in some way, and not mer ely a third party.

We also reject the government's ar gument that the notations on the memo portion of the checks wer e deceptive and the bank therefore paid the checks under false pretenses. There was no evidentiary support offered for the proposition that the bank was in any way deceived, or paid the checks because of any deception. To the contrary, the bank clearly paid the checks because it was obligated to honor Howerter's signature. It honored all checks -- with and without memo notations -- promptly upon presentation. While we will draw inferences in favor of the

_____

7. As we reference above, the District Court recited three "elements:" (1) Defendant took or carried away more than $100.00 of money in the custody of a bank; (2) Defendant did so intentionally, knowing that he was not entitled to it; and (3) the bank's deposits were insured by the FDIC. Dist. Ct. Op. at 2.

12

verdict winner, there are no facts from which we could infer that the memo notations had anything to do with the bank's decision to pay, let alone that it relied on them and was deceived.

Accordingly, we will REVERSE the judgment of the District Court.

13

STAPLETON, J., Concurring:

As the Court's opinion recounts, the scope of 18 U.S.C. S 2113(b) has been extended beyond common law larceny, i.e., the taking of property from the possession of a covered institution without its consent, to situations involving the taking of property from the possession of such an institution when its consent has been obtained thr ough false pretenses. So far as I am aware, however, it has never been applied to a case involving the taking of pr operty from the possession of a consenting covered institution when its consent has not been obtained by false pretenses. Our decision in United States v. Pinto, 646 F .2d 833 (3d Cir. 1981), seems to me to preclude our extending the scope of the statute to include such a case, and I concur in the judgment of the Court on that basis.

Here, Howerter practiced no deception on the bank; the checks were paid because the bank was obligated to honor his signature. While the government attempts to make much of the fact that some checks contained memos suggesting the future use of the withdrawn funds for scholarships and a senior class party, the bank's obligation to honor the checks signed by Howerter was the same whether or not they contained such notations. That those notations were wholly unrelated to the bank's consent to the withdrawals is evidenced by the fact that it honored all of the checks promptly on presentation.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit